QUEEN CITY PIZZA, INC.,
et al., Plaintiffs,

v.

DOMINO'S PIZZA, INC., Defendant.

No. 95–CV–3777.

United States District Court,
E.D. Pennsylvania.

April 30, 1996.

Lawrence T. Hoyle, Jr., Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, PA, Sheryl G. Snyder, Barry D. Hunter, Brown, Todd & Heyburn, P.L.L.C., Lexington, KY, for Plaintiffs.

Laurence Z. Shiekman, Thomas E. Zemaitis, Barbara T. Sicalides, Pepper Hamilton & Scheetz, Philadelphia, PA, Daniel F. Kolb, Thomas P. Ogden, Davis Polk & Wardwell, New York City, for Defendant.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

The plaintiffs in this antitrust action are eleven owners and operators of Domino's Pizza franchises located in Delaware, Florida, Illinois, Minnesota, Mississippi, New Hampshire, North Carolina, Pennsylvania and South Carolina, as well as International Franchise Advisory Council, Inc. ("IFAC"), a Michigan corporation whose members include approximately 40% of the Domino's Pizza franchisees located in the United States. IFAC brings this suit on its own behalf and on behalf of its member franchisees. On September 25, 1995, Plaintiffs filed an amended complaint against Domino's Pizza, Inc. ("DPI"), also a Michigan corporation, seeking (1) declaratory, injunctive and compensatory relief under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and (2) damages for DPI's alleged breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with contractual relations. DPI has since filed the instant motion for summary judgment as to the claims brought by IFAC in both its individual and representative capacities on the grounds that IFAC lacks standing. Moreover, DPI contends that the breach of contract, breach of covenant of fair dealing, and antitrust claims should be dismissed for failure to state a claim on which relief can be granted. We conclude that the facts set forth in the amended complaint do not give rise to causes of action cognizable under the federal antitrust laws. Accordingly, we will dismiss the antitrust claims pursuant to Fed.R.Civ.P. 12(b)(6) and dismiss the remaining claims in accordance with Rule 12(b)(1).

### FACTUAL BACKGROUND

The facts giving rise to this action, as recited in the amended complaint, are as follows. The Domino's pizza business is comprised of a network of stores that sell pizza and other food products largely on a take-out or delivery basis. The Domino's network consists of approximately 700 stores owned and operated by DPI and 3,500 stores owned and operated by Domino's franchisees. In order to acquire a Domino's franchise, a franchisee must enter into a franchise agreement[1] with DPI, pursuant to which the fran-

---

1. Plaintiffs state that while the terms of the franchise agreement have varied over the years, the

chisee is entitled to market food products under DPI's business format and trade and service marks in exchange for franchise fees and royalties. The franchise agreement is crafted so as to maintain uniformity and consistency of quality throughout the network. Franchisees must therefore purchase ingredients, materials, and supplies from either DPI or a DPI-approved supplier. The relevant provision of the franchise agreement reads as follows:

12.2 *Pizza Ingredients, Supplies and Materials.* All pizza ingredients, beverage products, cooking materials, containers, packaging materials, other paper and plastic products, utensils, uniforms, menus, forms, cleaning and sanitation materials and other supplies and materials used in the operation of the Store must conform to the specifications established by us [DPI] from time to time. You [franchisee] must use in the operation of the Store boxes, containers and other paper products imprinted with the Marks as prescribed from time to time by us. We may in our sole discretion require that ingredients, supplies and materials used in the preparation, packaging, and delivery of pizza be purchased exclusively from us or from approved suppliers or distributors. Any ingredient, supply or material not previously approved by us as conforming to our specifications and quality standards must be submitted for examination and/or testing prior to use. We reserve the right from time to time to examine the facilities of any approved supplier or distributor, including the commissary, if any, operated by you, and to conduct reasonable testing and inspection of ingredients, materials or supplies to determine whether they meet our standards and specifications. We also reserve the right to charge fees for testing and evaluating proposed suppliers or distributors and examining or inspecting operations and to impose reasonable limitations on the number of approved suppliers of any product. Approval of a supplier or distributor may be conditioned on requirements relating to frequency of delivery,

standards of service including prompt attention to complaints and the ability to service and supply Stores within areas designated by us.

Moreover, DPI is required "to exercise reasonable judgment with respect to all determinations to be made by us under the terms of [the franchise agreement]." Franchise Agreement § 22.9.

The franchisees purchase the great majority of the required ingredients and supplies from Domino's Pizza Distribution Division ("DPDD"), formerly a subsidiary and now a division of DPI. The nub of the amended complaint is that DPI employs the above-quoted franchise agreement provisions unreasonably, so that franchisees are effectively precluded from purchasing ingredients and supplies in a competitive market. For example, Plaintiffs contend that when they initiated efforts to produce fresh pizza dough at the store level, DPI arbitrarily increased the processing fees and altered the standards and inspection practices so as to eliminate any savings the franchisees may have realized, in an effort to protect DPDD from competition. Moreover, the franchisees producing fresh dough in approved commissaries were prohibited by DPI from selling the dough to other franchisees, even though the dough-producing franchisees could deliver the dough to other franchisees at a cost 25% to 40% less than DPDD's price.

In 1993, IFAC began to pursue alternative means of acquiring ingredients and supplies at more competitive prices for its member franchisees. To that end, IFAC entered into a purchasing affiliation agreement ("purchasing agreement") with FoodService Purchasing Cooperative, Inc. ("FPC") on June 15, 1994. Pursuant to the purchasing agreement, FPC was appointed to act as purchasing agent for the IFAC-member franchisees and to develop a cooperative purchasing plan for franchisees seeking to purchase ingredients and supplies from a source other than DPDD. Plaintiffs contend that once DPI became aware of IFAC's efforts, it initiated a campaign to prevent FPC from establishing

material provisions of the franchise agreements at issue here are substantially the same for each of the franchisee plaintiffs. Thus, Plaintiffs refer

in their complaint amended to a "Standard Franchise Agreement."

a cooperative purchasing program that would compete with DPDD. Thus, when IFAC and FPC requested that DPI provide specifications so that FPC could solicit bids from potential suppliers, DPI eventually issued specifications so vague that suppliers could not furnish FPC with meaningful price quotations. Further, Plaintiffs assert that in response to IFAC and FPC's efforts, DPI entered into exclusive dealing arrangements with a broad base of Domino's franchisees for the purpose of denying FPC a pool of purchasers sufficiently large to make the alternative purchasing effort feasible.

Plaintiffs allege that DPI has engaged in other anti-competitive conduct for the purpose of shielding DPDD from competition. DPI's alleged activity includes: (1) entering into an exclusive dealing arrangement with the only approved supplier of deep-dish pizza crusts, thereby effectively preventing FPC from arranging for the purchase of this ingredient from an alternative source; (2) effectively denying FPC access to approved pizza sauce suppliers and refusing to consider approving a low-cost alternative supplier for many months, even though the alternative supplier's product met DPI's standards for quality; and (3) commencing a "predatory pricing" effort, whereby DPI lowered prices on most ingredients and supplies to a level competitive with the prices FPC was expected to offer, while raising prices on fresh dough, an ingredient over which DPI maintained almost exclusive control, and tying the purchase of fresh dough to the purchase of other ingredients and supplies.

Finally, Plaintiffs contend that when it solicited them to become Domino's franchisees, DPI represented that DPDD was but one of a number of approved suppliers and that the terms of the franchise agreement would provide for a competitive purchasing environment. They claim that DPI reneged on this promise in the manner described above, forcing them to pay an additional $3,000 to $10,000 per store annually for ingredients and supplies. Moreover, Plaintiffs allege that they are effectively "locked in" to the franchises in view of their investments, and since DPI must approve any sale of a franchise and applies an unreasonably restrictive approval policy. Thus, any franchisee desiring to switch its investment to an alternative franchise system is likely to incur a significant financial loss.

## ANALYSIS

### A. The Antitrust Claims

As noted above, Plaintiffs seek injunctive relief and treble damages as a result of DPI's alleged violation of §§ 1 and 2 of the Sherman Act. In Count One, Plaintiffs contend that the facts set forth in the amended complaint constitute an unreasonable restraint on trade and a tying arrangement that is *per se* unlawful under § 1. Plaintiffs allege in Count Two that DPI has unlawfully monopolized the relevant market in violation of § 2. DPI contends that the antitrust claims should be dismissed pursuant to Rule 12(b)(6). Specifically, DPI argues that the amended complaint must be dismissed in light of Plaintiffs' failure to allege a relevant product market, and that to the extent Plaintiffs contend that the relevant market is the market for ingredients and supplies among Domino's franchisees, such a market definition must be rejected as a matter of law. We turn now to evaluate these arguments.

### 1. Standard of Review

■■■ We first address DPI's argument that the antitrust claims should be dismissed on the grounds that Plaintiffs have failed to allege a relevant market. DPI has thus challenged the legal sufficiency of Plaintiffs' antitrust claim. Accordingly, we must examine whether Plaintiffs have set forth facts which state a claim as a matter of law. *Taha v. I.N.S.*, 828 F.Supp. 362, 364 (E.D.Pa.1993). In so doing, the court must accept as true all of the factual averments in the complaint and extend to the plaintiff the benefit of every favorable inference that can be drawn from those allegations. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990). Thus, a complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim which would entitle him to relief. *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988).

## 2. *Relevant Market*

■ As stated above, Plaintiffs allege that DPI's conduct amounts to both an unreasonable restraint of trade and an unlawful tying arrangement under § 1. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A vertical non-price restraint, such as the one at issue in the instant case, is governed by the rule of reason, which requires an examination of whether the restraint had an anti-competitive effect in the relevant market. *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981) (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977)).

■ A plaintiff contending that defendant employed an unlawful tying arrangement must likewise identify the relevant market. A tying arrangement is an agreement by one party to sell a product (the tying product) to a buyer, but only on the condition that the buyer also purchase from the seller a different product (the tied product). *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 2079–80, 119 L.Ed.2d 265 (1992); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 854 F.Supp. 367, 377 (E.D.Pa.1994), *aff'd*, 51 F.3d 1191 (3d Cir.1995). The "essential characteristic" of a tying arrangement violative of § 1 "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). Thus, there can be no Sherman Act violation in the absence of the seller's ability to "force" the buyer to act in a manner different from the way he would behave in a competitive market. *Id.* at 13–14, 104 S.Ct. at 1558–59. This ability is termed "market power" in the tying market—the ability of the seller to raise price and restrict output. *Kodak*, 504 U.S. at 464, 112 S.Ct. at 2080–81.

■ Plaintiffs further contend that DPI is liable under § 2 for its monopolization or attempted monopolization of the relevant market. Section 2 sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. In order to sustain a claim for monopolization, a plaintiff must show that the defendant (1) possessed monopoly power in the relevant product and geographic markets; and (2) acquired and maintained that power wilfully, as distinguished from having developed its business as a result of a superior product, business acumen, or historic accident. *Borough of Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (1982) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). As for attempted monopolization, a plaintiff must show (1) that defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power, an inquiry requiring an examination of the relevant market and the defendant's ability to affect competition in that market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993). Monopoly power, like market power in the § 1 context, is generally defined as the ability to control price and exclude competition within the relevant product and geographic markets, and is usually determined by examining the extent of the alleged monopolist's market share. *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n of Pennsylvania*, 745 F.2d 248, 260 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985); *Lansdale*, 692 F.2d at 313.

■ Thus, in order to state a Sherman Act claim under either § 1 or § 2, a plaintiff must identify the relevant product and geographic markets and allege that the defendant exercises market power within those markets. *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 877 (3d Cir.1995); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir.1991), *cert. denied*, 505 U.S.

1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992).[2] The relevant product market is defined as "those 'commodities reasonably interchangeable by consumers for the same purposes.'" *Tunis Bros.,* 952 F.2d at 722 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007–08, 100 L.Ed. 1264 (1956)). In determining the relevant product market, the court examines the cross-elasticity of demand; that is, the court considers, in light of the product's characteristics and price, the extent to which a rise in price of the product creates a rise in demand for like products in that market. *Id.* The relevant geographic market consists of the area in which customers would look to purchase the product. *Id.* at 726.

While they do not explicitly identify the relevant product and geographic markets in their amended complaint, it is clear from the context, and confirmed in their memorandum in opposition to the instant motion, that Plaintiffs consider the relevant product market to be the market for ingredients and supplies among Domino's franchisees. Further, Plaintiffs argue that the franchisees are "consumers" for purposes of this litigation, and that the relevant geographic market encompasses the entire nation. Thus, in support of its tying claim, for example, Plaintiffs assert that DPI enjoys monopoly power over pizza dough, and uses it both to exclude other potential sellers from the market and to charge super-competitive prices for other ingredients and supplies. Moreover, Plaintiffs allege that DPI possesses monopoly power in the market comprised of Domino's franchisees, and that it improperly uses that power to exclude DPDD's potential competitors from the market.

■ For its part, DPI contends that as a matter of law, a relevant market cannot arise from a franchise agreement. Thus, this case presents the issue of whether the antitrust laws are implicated where a franchisor dominates a "market" created by virtue of franchise agreements. In the past, courts have concluded that an illegal tying arrangement can arise in the franchise context where franchisees are compelled to purchase equipment or other tied products from the franchisor in order to obtain the franchise. *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980); *Northern v. McGraw–Edison Co.,* 542 F.2d 1336, 1345 (8th Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); *Siegel v. Chicken Delight,* 448 F.2d 43, 49 (9th Cir. 1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). In these cases, the courts concluded that the defendants possessed market power as a result of the unique nature of the franchise's trademark, a basis for market power that has since been discredited. *See Mozart Co. v. Mercedes–Benz of N. Am., Inc.,* 833 F.2d 1342, 1346 (9th Cir.1987), *cert. denied,* 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988) ("[W]hile many individual purchasers of automobiles undoubtedly regard a Mercedes as unique, it is by no means clear that franchisees (dealers) view the Mercedes in the same manner. To them it is an article that is purchased at wholesale and sold at retail."). Still, these cases illustrate the key distinction to be drawn in defining market power in the franchise context: that between a franchisor's pre-contractual market power versus the post-contractual economic power it possesses under the contract. Two influential commentators describe the distinction as follows:

> The important economic distinction that must be made is between pre- and postcontract economic power. Precontract, competition among franchisors (such as McDonald's or Kentucky Fried Chicken) to sign up franchisees prevents [a single franchisor] from exercising any economic power in setting contract terms with potential franchisees. [The franchisor], although it possesses a trademark, does not possess any economic power in the market in which it operates—the fast food franchising (or perhaps, more generally, the franchising) market.

2. This is not to say that the degree of the defendant's dominance of the relevant market that would trigger liability under § 1 would necessarily raise a § 2 claim. The Supreme Court has long held that "[m]onopoly power under § 2

requires, of course, something greater than market power under § 1." *Kodak,* 504 U.S. at 481, 112 S.Ct. at 2090 (citing *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969)).

Postcontract, on the other hand, a franchisor can use the threat of termination to "hold up" a franchisee that has made a specific investment in the marketing arrangement. However, *this potential economic power has nothing to do with market power, ultimate consumers' welfare, or antitrust.*

Benjamin Klein & Lester F. Saft, *The Law and Economics of Franchise Tying Contracts,* 28 J.Law & Econ. 345, 356 (1985) (emphasis added). Thus, market power in the pre-contractual setting derives not from the trademark or from the franchisor's power to award a franchise, but instead focuses on the product, and is defined by the extent to which the franchisor is able to force a potential franchisee to purchase a tied product rather than acquire a franchise to sell a competing brand. *Mozart,* 833 F.2d at 1346.

As we noted above, Plaintiffs here do not allege that DPI enjoyed market power in the fast food franchise business such that it could force potential franchisees to purchase a tied product. Instead, they contend that DPI has employed its contractual power to coerce existing franchisees to purchase ingredients and supplies from DPDD. Accordingly, they assert that the relevant market is the market for ingredients and supplies among Domino's franchisees. The court in *Tominaga v. Shepherd,* 682 F.Supp. 1489 (C.D.Cal.1988), rejected just such an attempt to define the relevant market in the post-contractual context when presented with facts similar to the ones at issue here:

Plaintiff's implicit argument is that the relevant market is the "Pizza Man" franchising market. This market definition is erroneous as a matter of law. No reasonable argument can be made that Pizza Man possesses the power to coerce potential franchisees to purchase the tied product rather than sell a different brand of fast food (the tying product). The analysis must take place at the "pre-contract" stage. Klein & Saft, *supra,* at 356. Plaintiff, however, engages in "post-contract" analysis concerning defendant's power over already existing franchises by virtue

of their "sunk costs." This argument was explicitly rejected in *Mozart.* *Id.* at 1494.

■ We conclude that such reasoning applies here and compels the dismissal of Plaintiffs' antitrust claims. The economic power DPI possesses results not from the unique nature of the product or from its market share in the fast food franchise business, but from the franchise agreement. And as recognized above, allegations of wrongdoing in the post-contractual setting implicate principles of contract, and are not the concern of the antitrust laws. *Id.* at 1495 & n. 4. Thus, we must conclude that the relevant market definition Plaintiffs urge in support of their antitrust claims—one that encompasses the market for ingredients and supplies among Domino's franchisees—fails as a matter of law. *See Ajir v. Exxon Corp.,* No. C 93–20830, 1995 WL 429234, at *3 (N.D.Cal. July 7, 1995) ("Just because Exxon's direct serve dealers may contractually purchase gasoline from only one source—Exxon—does not mean that the relevant market is Exxon gasoline."). Moreover, Plaintiffs have failed to allege, and most probably could not allege, that DPI possesses market power such that it could coerce potential franchisees to purchase tied goods against their will. Accordingly, since Plaintiffs have failed to set forth the relevant market, they have failed to plead claims on which relief under the antitrust laws could be granted.

■ In their effort to defeat the instant motion, Plaintiffs cite the Supreme Court's *Kodak* opinion and argue that (1) a single brand may constitute a market for antitrust purposes and (2) the definition of the relevant market can occur only after the development of a factual record. Such arguments, based upon the mistaken notion that the *Kodak* opinion applies to the instant case, demonstrate the fundamental flaw in Plaintiffs' theory of antitrust liability. In *Kodak,* the plaintiff-repair service organizations alleged that Kodak refused to provide them with specialized replacement parts, thereby forcing Kodak equipment owners to use only Kodak's repair services. In allowing the plaintiffs' claims to go forward, the Court rejected Kodak's argument that a single

brand or product can never be a relevant market for antitrust purposes, holding that, under certain circumstances, "one brand of a product can constitute a separate market." *Kodak*, 504 U.S. at 482, 112 S.Ct. at 2090. Unlike the present case, however, the service market for Kodak equipment arose due to the unique nature of the Kodak machines, and not by virtue of a valid and binding franchise agreement. And as we have concluded above, antitrust claims predicated upon a "relevant market" defined by the bounds of a franchise agreement are not cognizable. Thus, the amended complaint fails not because the purported relevant market arises from a single brand of a product, but because the "market" was created by virtue of the franchise agreements Plaintiffs freely entered.

More importantly, the *Kodak* Court noted that the relevant market inquiry primarily considers the choices available to the ultimate consumer: "The relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners." *Id.* at 481–82, 112 S.Ct. at 2090. Such an approach recognizes that the antitrust laws were enacted not to bolster individual firms, but "to protect the competitive process in order to help individual consumers by bringing them the benefits of low, economically efficient prices, efficient production methods and innovation." *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 794 (1st Cir.1988). Indeed, our Court of Appeals has held that no antitrust action may lie in the absence of harm to competition. *See Tunis Bros*, 952 F.2d at 728 (ordering judgment n.o.v. in favor of defendants on the grounds that plaintiffs failed to show injury to competition).

Plaintiffs' route around this bedrock premise of antitrust law is to assert in their memorandum that *they* are consumers, so that the relevant market should be defined with respect to the choices available to them. This assertion is belied by the amended complaint, of course, which reveals that Plaintiffs are in fact competitors "in the highly competitive retail food service market" who sell food products *to* consumers. Am.Compl. ¶ 25. As for competition generally, the *raison*

*d'etre* of antitrust law, Plaintiffs have failed to assert that any harm has resulted from DPI's alleged conduct. There are no allegations in the amended complaint relating to higher prices or restricted choice at the consumer level. Indeed, while Plaintiffs allege that DPI's actions have caused the franchisees to pay an additional $3,000 to $10,000 for ingredients and supplies per year, they concede in their memorandum that competition generally has not been harmed. Plaintiffs' theory of antitrust liability, in their words, "does not follow a single pizza to its ultimate consumer." Pls.' Memo. at 21. And as the axiom goes, antitrust laws exist to protect competition, not competitors. Thus, for this reason as well, Plaintiffs' antitrust claims must be dismissed.

### B. *The Pendent Claims*

Having determined that Plaintiffs' federal antitrust claims must be dismissed, we now conclude that the pendent claims should be dismissed pursuant to Rule 12(b)(1) for want of jurisdiction over the subject matter. First, since both DPI and IFAC are citizens of Michigan, we cannot exercise our diversity jurisdiction over the amended complaint. 28 U.S.C. § 1332. *See Stanley v. Exxon Corp.*, 824 F.Supp. 52, 53 (E.D.Pa.1993) ("complete" diversity is required before court may exercise jurisdiction pursuant to § 1332). Moreover, although Plaintiffs have brought a claim under the Declaratory Judgment Act, 28 U.S.C. § 1332, that statute merely provides a means of relief for aggrieved persons, and does not itself confer jurisdiction. *Gruntal & Co., Inc. v. Steinberg*, 854 F.Supp. 324, 332 (D.N.J.), *aff'd without op.*, 46 F.3d 1116 (3d Cir.1994). Finally, we are aware of no "special circumstances" that would justify the invocation of our supplemental jurisdiction. *Shaffer v. Board of School Directors*, 730 F.2d 910, 912 (3d Cir.1984). Accordingly, Plaintiffs' pendent claims will be dismissed without prejudice. *See TM Marketing, Inc. v. Art & Antiques Assocs., L.P.*, 803 F.Supp. 994, 997 (D.N.J.1992) ("When it becomes apparent that subject matter jurisdiction is lacking,

the court must dismiss the action regardless of the stage of the litigation.").[3]

### *CONCLUSION*

Since the relevant market on which Plaintiffs' antitrust claims are premised—that created by the power DPI exercises pursuant to the franchise agreement—cannot support those claims as a matter of law, and because Plaintiffs have alleged that harm has been visited only upon themselves and not upon competition generally, Plaintiffs have failed to state claims on which relief under the antitrust laws can be granted. Moreover, Plaintiffs' remaining claims must be dismissed pursuant to Rule 12(b)(1). In view of the conclusions we have reached above, we need not address the remaining issues raised in DPI's motion. An appropriate order follows.

### *ORDER*

AND NOW, this 30th day of April, 1996, upon consideration of Defendant's Motion for Partial Summary Judgment and to Dismiss, and the Response thereto, it is hereby ORDERED that said Motion is GRANTED in part as follows:

1. Counts One, Two, and Three of Plaintiffs' Amended Complaint are hereby DISMISSED WITH PREJUDICE;

2. Count Seven of Plaintiffs' Amended Complaint is hereby DISMISSED WITH PREJUDICE to the extent it seeks declaratory relief under federal antitrust laws; and

3. The remaining counts of Plaintiffs' Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE.

Plaintiffs may file a Second Amended Complaint within fourteen (14) days of the date of this Order.

---

**3.** We will allow Plaintiffs to file a second amended complaint that cures the amended complaint's jurisdictional defects within fourteen days of the date of the attached order.