Hugh COLLINS, et al., Plaintiffs,

v.

**INTERNATIONAL DAIRY QUEEN, INC. and American Dairy Queen Corporation, Defendants.**

**No. 5:94–CV–95–4 (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Oct. 7, 1997.

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, GA, Diane Green Smith, Chicago, IL, Lee Abrams, Chicago, IL, for Plaintiffs.

Emmet J. Bondurant, II, Atlanta, GA, Benjamin M. Garland, F. Kennedy Hall, Macon, GA, William L. Killion, Quentin R. Wittrock, Troy A. Bader, Minneapolis, MN, for Defendants.

## ORDER

OWENS, District Judge.

This class action lawsuit against International Dairy Queen, Inc. ("IDQ") and American Dairy Queen Corporation ("ADQ") is now before the court on defendants' motion for summary judgment on plaintiffs' claims that in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, defendants monopolized or attempted to monopolize a relevant market of "products sold to Dairy Queen franchisees located in the United States (outside of Texas)." Defendants' summary judgment motion is addressed to the legal sufficiency of plaintiffs' alleged product market for asserting their § 2 claims.

This court has previously denied summary judgment on the 15 U.S.C. § 1 tying claims, in which plaintiffs alleged that defendants unlawfully conditioned the sale of Dairy Queen franchises (the tying product) upon the purchase of related products in which defendants had a financial interest (the tied product). *See Collins v. International Dairy Queen, Inc.*, 939 F.Supp. 875 (M.D.Ga.1996). In both § 1 and § 2 claims, delineating the boundaries of the relevant markets depends upon reasonable interchangeability or cross-elasticity of demand between the product itself and the reasonable substitutes for the product. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510 (1962); *United States v. Grinnell Corp.*, 384 U.S. 563, 570–72, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). In other words, the relevant market must include products which consumers could substitute for the main product in the event of a price increase. In the previous tying opinion we held that a triable issue exists as to whether a proper market definition for the tying claims may be limited to soft-serve ice cream franchises, of which defendants control approximately 91 percent, or whether it must include the much larger market of fast-food franchises in general, of which defendants' share is approximately two percent.

Plaintiffs allege in their § 2 monopolization claims that defendants have leveraged their dominance in the soft-serve ice cream franchise market in order to gain power in the market for sale of food products and supplies to Dairy Queen franchisees. They offer evidence that defendants have exerted their market power by charging supracompetitive prices for goods and supplies which the franchisees cannot purchase elsewhere. They allege that defendants' misuse of their market power has resulted in the monopolization or attempted monopolization in the aftermarket of food products and supplies sold to the franchisees.

■■■ The acquisition of monopoly power gives the holder "the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595–97, 105 S.Ct. 2847, 2854, 86 L.Ed.2d 467 (1985). Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several states or with foreign nations shall be deemed guilty of a felony...." To establish a violation of § 2, plaintiffs are required to show: (1) possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Eastman Kodak Company v. Image Technical Services, Inc.*, 504 U.S. 451, 479–81, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992), quoting *Grinnell*, 384 U.S. at 570–72, 86 S.Ct. at 1704. To satisfy the first element plaintiffs must define and prove both a relevant product market and a relevant geographic market within which defendants exert power. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956). Proof of the second element requires evidence of anticompetitive or exclusionary conduct by the defendants. *Aspen*, 472 U.S. at 601–03, 105 S.Ct. at 2857.

■■ A claim of attempted monopolization requires proof: (1) that the defendant has engaged in predatory or anticompetitive conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456–58, 113 S.Ct.

884, 891, 122 L.Ed.2d 247 (1993); *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 993 (11th Cir.1993).

■ Defendants argue that plaintiffs' proposed market definition of "products sold to Dairy Queen franchisees" must fail as a matter of law. They contend that the proposed market ignores economic realities of interchangeability of products or cross-elasticity of demand and incorrectly defines a market based on contractual restrictions between the franchisor and franchisee. In *du Pont*, the Supreme Court refused to hold du Pont guilty of monopolization even though it manufactured 75 percent of all the cellophane in the United States. The Court concluded that the relevant market must include all flexible packaging materials, since cellophane was interchangeable with cellophane and other flexible wrappings. *Id.*, 351 U.S. at 403–06, 76 S.Ct. at 1012. Competition from other wrapping materials prevented du Pont's monopolization of the market because of the cross-elasticity of demand between its cellophane and other similar wrapping materials. *du Pont* stands for the principle that in defining a relevant market all reasonable substitutes for a product must be considered. *See also U.S. Anchor*, 7 F.3d at 995. However, whether one product is a reasonable substitute for another depends upon factual analysis and the "economic reality of the market at issue." *Kodak*, 504 U.S. at 467, 112 S.Ct. at 2082.

■ In this court's opinion denying summary judgment on the § 1 tying claims, the undersigned declined defendants' invitation to follow the district court's opinion in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F.Supp. 1055 (E.D.Pa.1996), *aff'd*, 124 F.3d 430 (3d Cir. Aug.27, 1997). The district court held that plaintiffs had failed to identify relevant product and geographic markets on both its § 1 and § 2 claims and ruled that antitrust claims cannot, as a matter of law, be premised on the relationship between a franchisor and its franchisees. The Third Circuit Court of Appeals, in its affirming opinion, held that plaintiff had not met its burden of establishing a relevant market for its tying and monopolization claims. *Queen City*, 124 F.3d at 440–42. In so ruling the Court interpreted the Supreme Court's reasoning in *Kodak* to be inapplicable to the franchisor/franchisee relationship. In the Third Circuit's view, because a franchisor's power derives from the franchise contract itself rather than from market forces, the aftermarket for goods and supplies sold to the franchisees cannot be defined as a separate market for antitrust purposes. IDQ/ADQ rely upon *Queen City's* interpretation of *Kodak* as a ground for dismissal of the monopolization claims of the Dairy Queen franchisees in this case.

In *Kodak* the Supreme Court upheld the lower court's denial of summary judgment on antitrust tying and monopolization claims, ruling that plaintiffs had raised a genuine issue of fact as to Kodak's power in the aftermarkets for service and parts for its photocopiers and micrographic equipment. Plaintiffs were independent service organizations ("ISO's") who had begun servicing Kodak equipment in the 1980's at a price substantially lower than Kodak charged for such services. The ISO's were financially damaged when Kodak adopted policies in 1985 and 1986 of selling necessary replacement parts only to Kodak equipment buyers who either repaired their own machines or agreed to use Kodak service. *Kodak*, 504 U.S. at 456–58, 112 S.Ct. at 2077. After the change in policy went into effect the ISO's were unable to obtain parts from reliable sources and were consequently either forced out of the business or lost substantial revenue. The new policy also had the effect of forcing many existing customers to accept Kodak service at a higher price when they would have preferred the service provided by the ISO's. *Id.*, 504 U.S. at 456–58, 112 S.Ct. at 2077–78. The ISO's alleged, as to the § 1 tying claim, that Kodak had tied the sale of service for Kodak machines to the sale of parts. *Id.*, 504 U.S. at 458–60, 112 S.Ct. at 2078. As to the § 2 monopolization claim, the ISO's claimed that Kodak had monopolized and/or attempted to monopolize the market for sale of service for its machines. *Id.*

Kodak argued that its service and parts could not constitute two separate markets capable of being tied. *Id.*, 504 U.S. at 462–

64, 112 S.Ct. at 2080. The Court found sufficient evidence, however, that the aftermarkets for service and parts were two distinct products and that Kodak had tied the two products by refusing to sell Kodak parts to customers unless they also agreed to accept Kodak's service. Thus, there was a triable issue whether Kodak had sufficient power in the parts market to force purchasers to buy unwanted service from it. *Id.*

Kodak also argued that its lack of power in the primary equipment market precluded it from having power in the aftermarkets for service and parts. *Id.,* 504 U.S. at 464–66, 112 S.Ct. at 2081. It contended that it would not be possible to raise prices of service and parts above that of a competitive market because of the competition which existed in the equipment market. Under Kodak's theory, any increase in profits deriving from higher prices in the equipment and service aftermarkets would result in lower profits in the equipment market as customers began substituting other, interchangeable equipment. *Id.,* 504 U.S. at 464–68, 112 S.Ct. at 2081–82. However, the Supreme Court declined to adopt a substantive legal rule that "equipment competition precludes any finding of monopoly power in derivative aftermarkets," and instead examined the actual market realities. *Id.,* 504 U.S. at 464–68, 112 S.Ct. at 2082. The Court found insufficient evidence to support Kodak's theory that higher prices for service would lead to a corresponding drop in equipment sales and noted instead that the company's restrictive sales policy had not been shown to result in decreased sales. *Id.,* 504 U.S. at 471–73, 112 S.Ct. at 2085. It found the ISO's had presented a reasonable theory why Kodak's argument was incorrect: the customers' difficulty in obtaining pre-purchase information as to the total combined costs of equipment, service and parts, as well as the significant costs required for the "locked-in" customers in switching to other equipment once the true costs became known. *Id.,* 504 U.S. at 471–75, 112 S.Ct. at 2085–86. There also existed the possibility of Kodak's negotiating lower prices for its sophisticated customers who were able to ascertain total costs prior to purchase while continuing to charge higher prices to its relatively unsophisticated customers who were unable to calculate their total costs. *Id.,* 504 U.S. at 473–77, 112 S.Ct. at 2086–87. Because plaintiff's market theory was reasonable and issues of triable fact remained concerning the relevant market and the justifications for Kodak's business practices, denial of summary judgment was upheld.

The Third Circuit in *Queen City* held that because the restrictions imposed upon franchisees are controlled contractually rather than by market forces, a franchisor's exercise of control over products sold in its franchised outlets does not violate the antitrust laws; thus, it reasoned that *Kodak* did not apply to a franchisor/franchisee relationship. In *Queen City,* franchisees of Domino's Pizza, Inc., alleged that Domino's had engaged in an unlawful tying arrangement by conditioning the sale of fresh dough (the tying product) to the purchase of ingredients and supplies (the tied product) from Domino's. They also alleged that Domino's had monopolized or attempted to monopolize the aftermarket for sales of supplies to its franchisees. *Id.,* 124 F.3d at 435–36. The Court found that because the dough, tomato sauce, and paper cups that met Domino's standards and were used by Domino's franchisees were interchangeable with, or had cross-elasticity of demand with, dough, sauce and cups from other suppliers and used by other pizza companies, the relevant market could not be limited to products approved by Domino's. *Id.* at 438. In so ruling, the court refused to accept plaintiffs' argument that the outcome of *Kodak* and the definition of the relevant markets required a different result. In the Third Circuit's view the *Kodak* holding depended on the uniqueness of the Kodak commodities which prevented them from being considered interchangeable with other products. In contract, the products and ingredients used by the Domino's franchisees were not unique; thus, they were interchangeable with other similar products on the market. The Court summed up its interpretation as follows:

> *Kodak,* we believe, held that a plaintiff's proposed relevant market in a unique and non-interchangeable derivative product or service cannot be defeated on summary

judgment by a defendant's assertion that the proposed derivative market is cross-elastic with the primary market, if there is a reasonable possibility that the defendant's assertion about cross-elasticity is factually incorrect. But *Kodak* does not hold that the existence of information and switching costs alone, such as those faced by the Domino's franchisees, renders an otherwise invalid relevant market valid. In *Kodak*, the repair parts and service were unique and there was a question about cross-elasticity. Judgment as a matter of law was therefore inappropriate. Here, it is uncontroverted that Domino's approved supplies and ingredients are fully interchangeable in all relevant respects with other pizza supplies outside the proposed relevant market. For this reason, dismissal of the plaintiffs' claim as a matter of law is appropriate.

*Queen City*, 124 F.3d at 438–40.

The *Queen City* court also emphasized the fact that the Domino's franchisees possessed preliminary knowledge that their ability to purchase cheaper supplies from alternative sources was subject to being controlled by the franchisor. The limitations which Domino's could impose upon its franchisees was spelled out in the franchise agreement, while in *Kodak* the company had changed its policies after the fact. The Third Circuit found it significant that Kodak equipment buyers were unable to calculate the higher costs at the time of purchase because the company's policy change was not foreseen at the time of sale of its equipment. *Queen City*, 124 F.3d at 440. Kodak's later policy was not disclosed by contract terms which were a part of the original transaction for equipment purchase, while Domino's authority to regulate supplies and quality standards was spelled out in the franchise agreement. Thus, the Domino's franchisees were deemed to have been given a choice whether to invest in a franchise arrangement which limited their choices. The Third Circuit found:

> If the contractual restrictions in ... the general franchise agreement were viewed as overly burdensome or risky at the time they were proposed, plaintiffs could have purchased a different form of restaurant,

or made some alternative investment. They chose not to do so. Unlike the plaintiffs in *Kodak*, plaintiffs here must purchase products from Domino's Pizza not because of Domino's market power over a unique product, but because they are bound by contract to do so. If Domino's Pizza, Inc. acted unreasonably when, under the franchise agreement, it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws.

*Queen City*, 124 F.3d at 440–42.

IDQ/ADQ urge the court to apply the holding of *Queen City* that the *Kodak* decision is not applicable to the franchisor/franchisee relationship and to find that plaintiffs' proposed market definition fails as a matter of law. *Queen City* limits *Kodak's* holding to situations where a defendant has dominated the market for products which are unique and thus by definition not interchangeable with other similar products. This interpretation is questionable, however. In *Wilson v. Mobil Oil*, 940 F.Supp. 944 (E.D.La.1996), the complaint alleged that defendants had engaged in an illegal § 1 tying arrangement by requiring SpeeDee oil change system business format franchisees to purchase motor oil and lubricant products from Mobil Oil in order to become and remain franchisees, and that the arrangement had resulted in franchisees' paying higher prices for what they deemed inferior products. The amount of information possessed by the franchisees at the time they signed the franchise agreements was unclear. The district court nevertheless ruled, on a motion to dismiss, that plaintiffs' proposed product market of "SpeeDee trademarks, trade names and copyrights" or alternatively "the market for providing quick automotive oil change, goods and services" could not be deemed invalid as a matter of law. *Mobil Oil*, 940 F.Supp. at 951. The district court ruled that the market power analysis in *Kodak* was not contingent on the uniqueness of the equipment but rather upon the "economic dislocations" resulting from the equipment owners' lack of information and switching costs. *Mobil Oil*, 940 F.Supp. at 951. Thus, there was no reason that a derivative aftermarket could not be created in the franchise context as well as in

the context of aftermarkets for the sale of business equipment.

Other cases have interpreted *Kodak* as hinging on such "economic dislocations" rather than on the uniqueness of the equipment. See, e.g., *PSI Repair Services, Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 2434, 138 L.Ed.2d 195 (1997); *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660 (6th Cir.1993). In *Virtual Maintenance*, a § 1 case, a jury verdict for plaintiffs had been reversed by the Sixth Circuit before the *Kodak* decision was handed down. The Supreme Court vacated and remanded the case for reconsideration in light of the *Kodak* holding. The Sixth Circuit found on remand that the alleged derivative aftermarket, which was the market for selling software and software revisions for use in designing Ford cars, could have supported an award by the jury on plaintiff's tying allegations.[1]

In the view of this court, the Third Circuit's ruling in *Queen City* is an incorrect interpretation of *Kodak*. The Supreme Court's decision did not depend primarily upon the uniqueness of the Kodak machines. Instead, the Court emphasized the fact that the equipment owners faced information and switching costs which limited their choices and prevented their utilization of ordinary market forces. Market forces in ordinary circumstances would have caused higher prices in the parts and service markets to be offset by lower profits in the underlying equipment market as customers began to purchase lower-priced interchangeable equipment. However, there was evidence that these market forces did not apply because of Kodak's exercise of its market power to prevent competition. The cost of pre-purchase information and the prohibitive switching costs for the equipment owners restrained them from purchasing competing parts or services from other sources and thereby setting the ordinary market forces into play. Thus, the limited choices available to owners of Kodak equipment led the Court to conclude that plaintiffs' theory of market definition was reasonable and that one brand in certain circumstances can form the relevant market for purposes of both § 1 and § 2.

*Kodak* provides no compelling reasons that its market analysis could not be applied to the facts of the present case. This Circuit has held that only one brand may form a relevant market in certain circumstances. *U.S. Anchor*, 7 F.3d at 998. In the context of a franchisor/franchisee relationship, the choices available to the franchisees may be limited by anti-competitive acts of the franchisors. As a result of adverse information and switching costs, franchisees also may be locked in to a situation whereby franchisors are able to exercise their market power to cause franchisees to have to pay supracompetitive prices, and to adversely affect the normal market forces which would ordinarily hold down the price of similar goods.

Plaintiffs offer evidence that they are required to pay supracompetitive prices for the food products and supplies which IDQ/ADQ sell to their system of authorized warehouses. As discussed in this court's previous tying opinion, defendants purchase food and supplies for resale to warehouses they have selected and authorized, and they profit from all the sales made to such warehouses. Defendants also make an additional profit by charging a fee to the warehouses for each sale of products to Dairy Queen franchisees. Defendants have retained the right to establish specifications not only for products containing the Dairy Queen logo or products produced expressly for the Dairy Queen stores, but also for numerous generic products such as various condiments, toppings, nuts, sugar and salt packets, and so forth. The profits defendants make from their sale

---

1. In conformity with its view that uniqueness was the deciding factor in *Kodak*, the *Queen City* court rejected the holding in *Virtual Maintenance* that Prime Computer's power over the software market resulted from its contract with Ford Motor Company. The court considered the Sixth Circuit's decision to be based on the uniqueness of the software package and revisions being sold by Prime Computer. *Queen City*, 1997 WL 526215, at *9. The dissenting judge in *Queen City* viewed the majority's interpretation of *Virtual Maintenance* as a misstatement of the facts. In the dissent's view, the lack of uniqueness of Prime Computers' product was shown by the fact that plaintiff manufactured products which were reasonably interchangeable with those of Prime Computers. *Queen City*, 124 F.3d at 447–48 (Lay, J., dissenting).

of the various approved products to their authorized warehouses and in turn to franchisees are substantial, far exceeding the profits generated from franchise fees and royalties.

In *Queen City*, the franchisor had specifically reserved to itself the right to require all supplies to be purchased exclusively from it or its approved distributors. Here, the 1974–1992 Dairy Queen Uniform Franchise Offering Circular ("UFOC") obligated defendants "to consider requests of Licensee for approval of specific alternate sources of supply and to cooperate with Licensee in this regard." The 1991 UFOC represented that "neither Franchisor nor any of its affiliates are the only approved suppliers of any goods, services, supplies, ... relating to the establishment or operation of the franchised business." Despite these assurances, there is evidence that when franchisees have sought to invoke their rights under the franchise agreement to seek approval of alternative suppliers, defendants have controlled the product approval process in such a way that new suppliers are prevented from entering into the market. For example, although the UFOC gave franchisees the right to obtain detailed specifications for products and supplies, in practice defendants have permitted franchisees only to inspect the detailed product specifications to verify their existence or have disclosed only summary specifications. Potential competing manufacturers are consequently unable in many cases to obtain sufficient information to produce an acceptable product which meets defendants' standards. Defendants have also changed logos or graphics which appear on plastic items or other Dairy Queen products during the course of negotiations with potential alternate suppliers, and they have engaged in protracted negotiations with potential new suppliers. Plaintiffs offer evidence that both these practices have had the effect of discouraging new suppliers from entering the market as competitors to IDQ/ADQ and have thereby rendered the approval process futile.

Defendants have also frequently refused to recognize the Dairy Queen Operators' Cooperative ("DQOC") as the agent of franchisees who seek a source of more competitive prices.[2] However, plaintiffs indicate that in every instance where DQOC has been able to enter the market and arrange for additional sources of supply, the competition has resulted in a reduction in the prices that the franchisees pay for approved food products and supplies. This constitutes evidence of the power defendants are able to exert over competitive market forces which could ordinarily lead to a reduction in prices from the standpoint of the franchisees. Where such competition is not available because of defendants' policies, the franchisees have no choice but to pay higher prices. Because the restrictions imposed by defendants prevent franchisees from being able to react to higher prices by purchasing competing products elsewhere, it is reasonable to conclude that there is a lack of interchangeability or cross-elasticity of demand between approved Dairy Queen products and similar non-approved products. This creates a triable issue whether plaintiffs' proposed market definition of "products sold to Dairy Queen franchisees located in the United States (outside of Texas)" is the relevant market for plaintiff's monopolization and attempted monopolization claims.

■ There is also a triable issue of fact whether, because of their lack of ability to anticipate defendants' withholding approval of alternate products and because of the high costs involved in switching to another franchise or business opportunity, the franchisees are locked in to the existing arrangement. Plaintiffs argue that the facts herein more clearly demonstrate a locked-in scenario than did the facts in *Queen City*. There is evidence that the limitations and restrictions IDQ/ADQ have placed on the approval process for new products became more onerous after the franchise agreements had already been entered into and the franchisees had made significant monetary outlays. Unlike the franchise agreements in *Queen City*

2. DQOC was organized on behalf of franchisees and store owners to negotiate directly with manufacturers in order to obtain more favorable prices than those charged by suppliers approved by defendants. Because of the larger number of franchisees which it represents, DQOC can provide assurance to manufacturers that certain minimum quantities will be ordered.

which gave Domino's the right to designate itself as the sole supplier of products, the Dairy Queen franchise agreements specifically provided for competition in the aftermarkets and for cooperation with the franchisees' efforts to find lower-priced products for approved products. Thus, it is reasonable to conclude that potential Dairy Queen franchisees could not have anticipated that defendants would act to restrict their choices by preventing competing manufacturers from entering the market. It follows that they could not have calculated the costs of paying higher prices for Dairy Queen-approved products as part of the total package for purchasing a franchise.

Plaintiffs have shown that Dairy Queen franchisees make significant financial investments in their franchises. The franchise agreements are long-term agreements which extend for as long as twenty years and provide for renewal as well as for the opportunity to participate in multiple store option programs at no additional franchise fee. Defendants retain the right to terminate or to refuse to renew a franchise agreement if the franchisee fails to carry the full authorized menu of food products or fails to meet defendants' product quality standards. If defendants terminate or refuse to renew a franchise agreement because of a franchisee's lack of compliance with the limitations imposed by IDQ/ADQ, the franchisee will face the significant costs of abandoning his investments, including the franchise fee and real property or leasehold improvements, and he will lose the multi-store option. If he decides to switch to a competing franchise system, he will be required to make significant additional investments in that system. Thus, the ability of a Dairy Queen franchisee to react to the increase in prices caused by defendants' suppression of competition in the relevant market by switching to a competing franchise or other business opportunity may be curtailed or prevented by financial considerations which lock him in to the existing restrictions and limitations.

Summary judgment may be granted only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. *56(c);*

*Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983). The party seeking summary judgment bears the initial burden of identifying portions of the pleadings, depositions, answers to interrogatories, and admissions which he believes demonstrate an absence of any genuine issue of material fact. The evidence and all factual inferences made therefrom must be viewed by the court in the light most favorable to the party opposing the motion. However, the opposing party cannot rest on his pleadings to present an issue of fact but must respond to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries,* 736 F.2d 656, 658 (11th Cir. 1984). The question is whether the record as a whole could lead a rational trier of fact to find for the non-movant. *Brown v. City of Clewiston,* 848 F.2d 1534, 1543 (11th Cir. 1988).

Plaintiffs have offered evidence sufficient to withstand the granting of summary judgment premised on defendants' assertion that they have failed as a matter of law to define a relevant product market. Plaintiffs' claim that defendants' anticompetitive actions and the limited choices available to the franchisees destroyed the interchangeability or cross-elasticity of demand between products approved by IDQ/ADQ and other similar products presents a triable issue. There also remains a genuine issue of fact as to whether the franchisees' inability to obtain information about the cost of food products and supplies in the franchise aftermarket, as well as the financial losses they would sustain by switching to a different franchise system, had the effect of curtailing their ability to react to price increases caused by defendants. Defendants have failed to establish that the relevant product market in this case could not be limited to "products sold to Dairy Queen franchisees" or that a jury could not find that defendants leveraged their power in the primary franchise market to monopolize or attempt to monopolize the aftermarket for supplies and products. Therefore, defendants' motion for summary judgment based upon plaintiffs' failure to define a relevant

product market for their monopolization claims is **DENIED**.