Wes WILSON, et al.

v.

**MOBIL OIL CORPORATION, et al.**

No. CIV. A. 95–4174.

United States District Court,
E.D. Louisiana.

Oct. 28, 1997.

As Amended Nov. 18, 1997.

James Frederick Willeford, New Orleans, LA, for Plaintiffs.

Charles Kirk Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, LA, Andrew J. Kilcarr, Maureen O'Bryon, William L. Monts, III, Lowell R. Stern, Hogan & Hartson, Washington, DC, for Defendant Mobil Oil Corp.

Steven W. Copley, Ernest Enrique Svenson, Gordon, Arata, McCollam & Duplantis, LLP, New Orleans, LA, Thomas E. O'Keefe, SpeeDee Oil Change & Tune–Up General Counsel, Madisonville, LA, for Defendants SpeeDee Oil Change Systems, Inc., G.C. & K.B. Investments, Inc.

### ORDER AND REASONS GRANTING SUMMARY JUDGMENT

VANCE, District Judge.

This matter is before the Court on the motion of defendants Mobil Oil Corporation, SpeeDee Oil Change Systems, Inc. and G.C. & K.B. Investments for summary judgment on plaintiffs' antitrust claims. For the reasons stated below, defendants' motion is GRANTED.

## INTRODUCTION

This is an action by present or former franchisees against defendants SpeeDee Oil Change Systems, Inc. ("SOCS"), a nationwide "quick lube" franchisor, G.C. & K.B. Investments, Inc. ("Investments"), SOCS' regional franchisor for the Gulf States, and Mobil Oil Corporation ("Mobil"), a manufacturer and seller of Mobil Oil greases and other automotive products. Plaintiffs claim that defendants violated state and federal antitrust laws by unlawfully conditioning the purchase and continued operation of SpeeDee franchises (the tying product) on their agreement to purchase only Mobil-brand lubricants and equipment (the tied product). Plaintiffs claim that defendants' refusal to permit them to purchase automotive supplies from vendors other than Mobil resulted in their paying supracompetitive prices for these products. Plaintiffs also claim that other suppliers were foreclosed from selling competing lubricant products to the franchise network by defendants' threats of litigation. As a result, plaintiffs claim they were forced to purchase inferior Mobil products when they would have preferred to purchase competing products less expensively from different suppliers.

On September 9, 1996, the Court denied defendants' motion to dismiss plaintiffs' tying claims. Defendants' motion was predicated on the argument that plaintiffs failed to allege: (1) that defendants had sufficient market power to invoke the per se rule against tying, and (2) that the arrangement created an adverse competitive effect in the tied product market so as to violate the Rule of Reason. Defendants also argued that the single brand aftermarket theory recognized by the United States Supreme Court in *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 461, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992), did not apply because plaintiffs were aware of the tying arrangement before they entered the franchise agreements. Largely because there was no clear factual record as to what information was available to plaintiffs before they entered their franchise agreements, the Court held that it could not hold as a matter of law that plaintiffs failed to state a claim under

*Kodak.* Defendants now assert that the factual record developed during discovery justifies the grant of summary judgment. The Court agrees. The relevant factual background of this dispute is as follows.

## FACTUAL BACKGROUND

Defendant SOCS developed a system for operating car care centers offering oil changes, tune ups and other basic automotive services under the trade name "SpeeDee Oil Change and Tune–Up" ("SpeeDee") and related trademarks. Investments was a subfranchisor of SOCS, which sold SpeeDee franchises in the Gulf States. SpeeDee franchises are sold throughout the United States and in several foreign countries.

The SpeeDee franchise is a business format franchise in which SpeeDee franchisees were provided a system for operating their businesses in exchange for an initial franchise fee and continuing royalties. A business format franchise permits an entrepreneur to use the business ideas, methods, operations and expertise that have been developed by the franchisor in operating his own business. Business format franchises typically involve the use of a common brand name or service mark by the franchisees to independently market a product or service.

This dispute involves the supply arrangements used in the SpeeDee franchise. Before June 1988, SOCS had an agreement with Burmah–Castrol ("Castrol"), a manufacturer and supplier of motor oil and automotive lubricants, in which Castrol agreed to provide each SpeeDee franchisee with up to $20,000 of oil dispensing and other equipment for its store. If the franchisee did not purchase a specified amount per year of Castrol products or if it became past due on any monetary obligation to Castrol for 60 days more than twice during any six-month period, the franchisee could be required to purchase the equipment from Castrol at its then depreciated value. (*See* Defs.' Mot. Summ. J., Exhs. 17 & 18.) At the time, Castrol was the only supplier of lubricants approved by the franchisor. Kevin M. Bennett of SOCS testified that Castrol terminated its relationship with SpeeDee in 1988, at which time SpeeDee talked to a number of other oil compa-

nies before establishing a relationship with Mobil. (*See* Defs.' Mot. Summ. J., Exh. 16.)

In June 1988, Mobil and SOCS entered into a contract under which Mobil would offer to SpeeDee franchisees an equipment package worth up to $25,000, provide promotional assistance to SpeeDee franchisees and make contributions to an advertising fund. In return, SOCS made the Mobil brand of motor oil the recommended primary lubricant ("oil of choice") at all SpeeDee franchised outlets. In effect, this made the Mobil brand the only approved brand for purchase in bulk by SpeeDee franchisees.

The parties agree that the Mobil brand was not the exclusive brand that could be used by SpeeDee franchisees; rather, Spee-Dee franchisees could use other brands of motor oil in bottles and small tanks. Some franchisees sold substantial quantities of other brands of motor oil. SOCS retained the right to approve other brands of motor oil.

SpeeDee franchisees were not required to buy Mobil products directly from Mobil unless they chose to avail themselves of the $25,000 equipment package, which virtually all of the franchises did. In that event, Mobil required the franchisee to enter a ten-year supply agreement to purchase 120,000 gallons of automotive lubricants directly from Mobil, and it also required a reimbursement agreement. If the franchisee purchased 120,000 gallons from Mobil during the ten-year period or shorter time, it owed Mobil nothing for the $25,000 worth of equipment advanced by Mobil.

In May of 1991, Mobil and SOCS entered into a second agreement, which provided Mobil with the "oil of choice" designation for a 15-year term in exchange for a payment to SOCS of $650,000. (*See* Defs.' Mot. Summ. J., Exh. 25.) The second Mobil–SOCS contract did not change Mobil's obligations with respect to the equipment program, advertising contributions or other promotional activities. In the second agreement, SpeeDee granted Mobil a security interest in 40% of its stock to secure a liquidated damages provision. The agreement required SpeeDee to pay liquidated damages of specified amounts

if it terminated the agreement before the expiration of its term. The Mobil/SpeeDee arrangement was terminated in 1997.

Each of the franchisees received a Spee-Dee uniform franchise offering circular ("UFOC") in connection with executing the SpeeDee franchise contract.[1] Plaintiffs Jimmy L. Elliot ("Elliot") and Richard Axtell ("Axtell") became SpeeDee franchisees in April 1988 and August 1988, respectively. The UFOC's provided to Elliot and Axtell in the month prior to their becoming franchisees disclosed the following information in item 9, entitled "OBLIGATIONS OF FRANCHISEE TO PURCHASE OR LEASE IN ACCORDANCE WITH SPECIFICATIONS OR FROM APPROVED SUPPLIERS:"

> Franchisor (SOCS) reserves the right to require that the Region and/or its local Franchisees purchase and use specific brand name items to be used in the operation of the franchise.... Franchisor reserves the right to require that all products used by the Region and/or its local Franchisees meet franchisor's quality standards and other reasonable requirements. (p. 17–18)

> \* \* \*

> The Franchisor has designated Burmah–Castrol, Inc. ("Castrol") as the exclusive lubricant supplier at all affiliated SpeeDee Oil Change & Tune Up locations and as the recommended primary lubricant supplier at all franchised locations. Castrol is currently the only approved supplier of lubricants.... and Franchisor has the right, under the Franchise Agreement, to require the Franchisee to only use approved brand-name items (including lubricants).... (p. 19)

> \* \* \*

> Castrol is the only entity currently meeting the Franchisor's standards (including advertising contribution and equipment arrangements) for lubricants.... and is the Franchisor's only recommended lubricant supplier. (p. 19)

> \* \* \*

---

1. The Federal Trade Commission requires franchisors to disclose certain information to all prospective franchisees. *See* 16 C.F.R. § 436.1 (1995).

Equipment provided to the Franchisee by Castrol is made available under the terms and conditions set forth in Exhibit "D" attached hereto and subject to a standby letter of credit required by Castrol (Exhibit "E" attached hereto).

\* \* \*

Under the terms and conditions required by Castrol ..., if the Franchisee fails to purchase at the rate of 10,000 gallons ... per year of Castrol products, or if the Franchisee uses the equipment for other than Castrol products, fails to pay for purchases of Castrol products when due, or breaches the terms and conditions required by Castrol, as set forth in Exhibit "D", in any way, the Franchisee will be required to purchase the equipment from Castrol at its then depreciated value or, at Castrol's option, return the equipment to Castrol. (p. 20)

\* \* \*

Castrol has agreed to supply under the Loaned Equipment Agreement, free of charge, up to $20,000 in lubrication equipment (including installation) to new affiliated and franchised locations.... The equipment is required by Castrol to be used solely for storage and dispensing of Castrol products. (p. 21)

\* \* \*

Franchisee must provide Castrol with an irrevocable standby letter of credit equal to the original value of the equipment and installation.... (p. 21)

\* \* \*

Castrol has also agreed to make available to all SpeeDee Oil Change & Tune Up Franchisees all of its marketing and promotional allowance programs. (p. 21)

\* \* \*

Approval [by the Franchisor] of any other supplier than Castrol as the "primary supplier" of lubricant items to franchise locations ... is not viewed by the Franchisor as likely at this time. However, the Franchisor reserves the right to disapprove

Castrol and/or approve another supplier in the future.... (p. 22)

(Defs.' Mot. Summ. J., Exhs. 17 & 18.)

Plaintiffs Milton I. Rizan, Jr. ("Rizan") and Wesley S. Wilson ("Wilson") became SpeeDee franchisees in April 1989 and January 1991, respectively. The UFOC's provided to these plaintiffs disclosed the following information in Item 9, also entitled "OBLIGATIONS OF FRANCHISEE TO PURCHASE OR LEASE IN ACCORDANCE WITH SPECIFICATIONS OR FROM APPROVED SUPPLIERS:"

[F]ranchisor (SOCS) reserves the right to require that the Region and/or its local Franchisees purchase and use specific brand name items to be used in the operation of the franchise.... [F]ranchisor reserves the right to require that all products used by the Region and/or its local Franchisees meet Franchisor's quality standards and other reasonable requirements. (p. 21)

\* \* \*

The Franchisor has designated Mobil Oil Corporation ("Mobil") as the exclusive lubricant supplier at all affiliated SpeeDee Oil Change & Tune Up locations and as the recommended primary lubricant supplier at all franchised locations. Mobil is currently the only approved supplier of lubricants.... Franchisor has the right, under the Franchise Agreement, to require the Franchisee to only use approved brand-name items (including lubricants).... (p. 22)

\* \* \*

Mobil is the only entity currently meeting the Franchisor's standards (including advertising contribution and equipment arrangements) for lubricants ... and is the Franchisor's only recommended lubricant supplier. (p. 23)

\* \* \*

Equipment provided to the Region by Mobil is made available under the terms and conditions of a Reimbursement Agreement, Supply Contract and other documents contained in Exhibit "D" attached hereto [Mobil documents] and subject to 1)

a security interest retained by Mobil, and 2) a certificate of deposit, irrevocable letter of credit or passbook assigned to Mobil. (p. 23)

\* \* \*

*The Franchisee should note that participation in the Mobil Equipment Reimbursement Program is entirely voluntary, is not required by SOCS or any Region and the requirements for participation in such program are established by and subject to the control of Mobil Oil Corporation.* While SOCS currently places no restrictions on where Franchisees may purchase Mobil products, Mobil Oil Corporation makes it a requirement for participation in its Equipment Reimbursement Program, for compliance with the Mobil Equipment Reimbursement Agreement and Supply Contract and for eligibility for marketing assistance programs ... that the Franchisee purchase specific amounts [including 85% of the Franchisee's requirements] of lubricants only from Mobil Oil Corporation. Eligibility and conditions for participation in the Mobil Equipment Reimbursement Program ... are ultimately determined by Mobil Oil Corporation, not SOCS ..., and the terms of participation in such programs, the features thereof, pricing and ... other aspects of the equipment reimbursement and supply arrangements are established by Mobil and *may be changed by Mobil at any time. Prospective Franchisees should make an inquiry regarding current terms and conditions prior to making any commitments.* (p. 24) (emphasis added).

\* \* \*

The form of Reimbursement Agreement [contained in Exhibit "D"-Mobil Documents] specified by Mobil establishes general requirements for participation in Mobil's Equipment Reimbursement Program and provides that Mobil will supply at its expense, on the terms and conditions set forth in that agreement, certain oil dispensing equipment costing up to $25,000. Mobil requires that, in order to participate in this program, the Franchisee must agree to purchase [generally] at least 120,-000 gallons [or at least 100,000 gallons at an increased price] of Mobil Lubricants from Mobil Oil Corporation in the ten year term of the contract.... (p. 25)

\* \* \*

[Upon termination of the Mobil agreements before the expiration of the ten year term], the Franchisee is required to pay Mobil a sum in cash determined by multiplying the cost of the equipment by a fraction, the numerator of which will be 120,000 gallons less the number of gallons of lubricant actually purchased by the Franchisee from Mobil Oil Corporation from commencement to termination ... of the Reimbursement Agreement and the denominator of which is 120,000 gallons. (pp. 25–26)

\* \* \*

The amount of Mobil lubricants the Franchisee purchases from Mobil Oil Corporation can also affect the price the Franchisee pays for such lubricants and calculations under the above formula [in that] if, during a calendar year, the Franchisees purchases from Mobil ... are less that 12,000 gallons, ... the price per gallon will increase by twenty cents per gallon ... and the numerator in the above formula will be set at 12,000 gallons. (p. 26)

\* \* \*

Approval by the franchisor of any other supplier than Mobil as the "primary supplier" of lubricant items to franchise locations ... is not viewed by the Franchisor as likely at this time. However, the Franchisor reserves the right to disapprove Mobil and/or approve another supplier in the future.... (p. 28)

(Defs.' Mot. Summ. J., Exhs. 21 & 22.)

Plaintiff George Gerhart became a Spee-Dee franchisee in February 1994. The UFOC provided to him contained similar information in Sections VIII and IX, including the following statements:

SOCS has designated Mobil Oil Corporation ("Mobil") as the "Oil of Choice," the

recommended primary lubricant supplier, at all franchised locations. (p. 24)

\* \* \*

Mobil is the only entity currently meeting the SOCS' standards (which include advertising contribution and equipment arrangements) for lubricants.... SOCS reserves the right to disapprove a supplier, including Mobil.... (p. 25)

\* \* \*

On May 8, 1991 SOCS entered into a strategic alliance with Mobil ... under which it receives a quarterly allowance based on actual lubricant purchases by franchisees ... [which] may range from Zero Dollars ($0) to One Hundred Fifty–Five Thousand Dollars ($155,000) in any quarter ... with a maximum payment ... over a 15 year period of $500,000.... The Franchisee is in no way required to buy lubricants from Mobil directly. However,... to participate in the Equipment Reimbursement Program explained below, the franchisee must purchase at least 85% of its total lubricant requirements from Mobil. (p. 25)

\* \* \*

Under the agreement between SOCS and Mobil, Mobil will provide ... up to Twenty–Five Thousand Dollars ($25,000) worth of certain equipment to be used in the dispensing of Mobil products.... The Franchisee will retain title to such equipment, subject to the Reimbursement Agreement (contained in Exhibit C) and a security interest ... retained by Mobil. In connection with the Equipment Reimbursement Program, the Franchisee must enter into a supply contract with Mobil whereby the Franchisee agrees to purchase at least one hundred twenty thousand (120,000) gallons (or 100,000 at an increased price) of Mobil lubricants from Mobil during the term of the contract which will include yearly usage commitments ... (the "Supply Contract") (contained in Exhibit C). Franchisee will not be terminated under the Reimbursement Agreement or Supply Contract as long as the Franchisee purchases at least eighty-five percent (85%) of its total lubricant requirements from Mobil. The Franchisee

should note that participation in the Mobil Equipment Reimbursement Program is entirely voluntary and is not required by SOCS or Region. The requirements for participation on such program are established by and subject to the control of Mobil Oil Corporation. If the Franchisee voluntarily participates in the Equipment Reimbursement Program and fails to comply with the terms of the Reimbursement Agreement or the Supply Contract, or fails to meet the usage requirements contained in the Mobil documents included in Exhibit C, the Franchisee may be liable for all or a portion of the price of the equipment advanced by Mobil and may be charged higher prices for lubricants than if the terms and requirements were met. (p. 26)

(Defs.' Mot. Summ. J., Exh. 22.)

The UFOC's also contained specimen versions of the then current local franchise agreement, along with financial statements, which set forth the terms of the SpeeDee–Mobil arrangement. Plaintiffs Elliot and Axtell signed their franchise agreements during the time period when Castrol was the oil of choice, but SpeeDee switched to Mobil as the oil of choice before they opened for business. Plaintiffs Wilson, Rizan and Gerhart all purchased SpeeDee franchises after Mobil became the oil of choice.

All of the franchise agreements provide that the franchisee may offer for sale only those products approved in writing by the franchisor. Wilson, Axtell, Elliot and Rizan specifically initialed paragraph 2.5 of their franchise agreements, which provided "[T]he Franchisee shall only use such ... items, ... services and suppliers as are approved in advance by SOCS." (Defs.' Mot. Summ. J., Exhs. 13, 9, 7, 11.) Gerhart's franchise agreement likewise confirmed that the franchisee would "sell or offer for sale only such products and services ... as have been expressly approved for sale," and "shall offer to customers only the product ... assortment prescribed from time to time by Region ... or previously approved in writing by Region or request in writing, Region's approval for new products." (Defs.' Mot. Summ. J., Exh. 15 at ¶ V.D.) Gerhart's contract further provided that "franchisee shall purchase all

products, equipment, supplies, services and other materials ... from the Region or a designated approved supplier." (*Id.* at ¶ V.L.)

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The proof must be of such quality that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The movant is entitled to judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion, the burden shifts to the party opposing summary judgment to demonstrate genuine issues of material fact necessitating a trial, using the evidentiary sources set forth in Rule 56(c). *Id.* at 324, 106 S.Ct. at 2553.

## DEFENDANTS' MOTION

Defendants' motion for summary judgment asserts the following arguments: (1) that defendants had an insufficient share of the tying product market to satisfy the market power element of a per se illegal tying claim; (2) that there is no evidence of information or switching costs warranting an aftermarket tying analysis under *Kodak;* and (3) there is no evidence the alleged tie had or is likely to cause an anticompetitive effect in the tied product market. In support of its motion, Mobil has submitted the parties' uniform offering circulars and franchise agreements, deposition excerpts, and a report by a Stanford University economist, which opines on

the definition of the relevant market, the existence vel non of information and switching costs to a prospective franchisee, as well as on the competitiveness of Mobil's pricing. Defendants' economist defined the relevant market as all franchises for which successful operation does not require specialized knowledge and that require an initial investment that is comparable to that of the SpeeDee franchise. (*See* Defs.' Mot. Summ. J., Exh. 5.) Plaintiffs have not submitted an expert report in support of their economic theories. Plaintiffs concede that if the market is defined as the franchise market, Mobil has no market power. Plaintiffs contend, however, that summary judgment must be denied on their claim that the tying arrangement is per se illegal because defendants have not presented evidence that there was sufficient information at the precontract stage to permit accurate lifecycle pricing. Plaintiffs also rely on anecdotes of price complaints and threats by defendants to initiate litigation for tortious interference with contract if other suppliers sought to sell to the SpeeDee franchise network.

## APPLICABLE LEGAL FRAMEWORK

██ A tying arrangement is "an agreement by a party to sell one product but only on condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co.,* 504 U.S. at 461, 112 S.Ct. at 2079 (quoting *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958)). A tying arrangement violates Section 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market, and the arrangement effects a substantial volume of commerce in the tied product market. *Eastman Kodak Co.,* 504 U.S. at 462, 112 S.Ct. at 2079–80. Under Fifth Circuit authority, plaintiffs may establish that a tying arrangement is illegal per se under the antitrust laws by demonstrating that defendants had sufficient control over the tying market to have a likely anticompetitive effect on the tied product market. *See Breaux Bros. Farms, Inc. v. Teche Sugar Co.,* 21 F.3d 83, 86 (5th Cir.1994).

■ The Fifth Circuit has recently stated that "market power is a necessary prerequisite to an illegal tie." *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236 (5th Cir.1996), *cert. denied,* ─── U.S. ───, 117 S.Ct. 960, 136 L.Ed.2d 846 (1997). In the tying context, market power is usually the "special ability ... to force a purchaser to do something he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Market power is generally measured by market share, but it can be demonstrated by direct evidence that defendants raised prices and drove out competition in the tied product market. *See Breaux Bros. Farms, Inc.*, 21 F.3d at 87 n. 3. In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2, the Supreme Court found a 30% market share insufficient to warrant application of the per se rule to a challenged tying arrangement. *Id.* at 27, 104 S.Ct. at 1566. It has been observed that, since *Jefferson Parish,* no court has accepted a market share below 30% as evidence of sufficient market power to warrant application of the per se rule. *See* ABA Section of Antitrust Law, Antitrust Law Developments (Fourth) Vol. I, at 194 (1997) (citing cases). The definition of the relevant market and the issue of market power are critical in this case because plaintiff concedes that if the market is defined as the franchise market, Mobil has "no market power." (Pls.' Mem. Opp. Defs.' Mot. Summ. J. at 10–11.)

■ As discussed below, this Court finds that plaintiffs have failed to raise a material issue of fact that defendants have market power in any relevant market. The relevant product market alleged in the complaint is either the "SpeeDee registered and statutory trademarks, trade names, and copyrights which possess economic distinctiveness" (Complaint at ¶ 9), or "the quick or fast lubricant market providing automobile oil change goods and services," exclusive of "service stations, automotive repair shops, automobile dealers or major consumer general product retailers, such as K–Mart and Wal–Mart." (*Id.* at ¶ 10). Plaintiffs have apparently abandoned these contentions, now asserting in their opposition to Mobil's summary judgment motion that the relevant market is limited to the SpeeDee franchise network, which plaintiffs refer to as the "SpeeDee franchise aftermarket." *Id., passim.*

It is clear that if market power is measured at the time plaintiffs entered their franchise contracts with SpeeDee, SpeeDee lacked market power. Defendants assert that the relevant market consists of all franchises requiring comparable initial investments and that do not require specialized knowledge. (*See* Defs.' Mot. Summ. J., Exh. 5.) They rely on the report of their expert economist, who bases his opinion on the fact that several plaintiffs testified in their depositions that they had no particular franchise in mind when they began looking for business opportunities, that some attended franchise shows, and that others considered franchise opportunities such as fast food outlets or several other quick lube outlets. (*Id.* at 17–18, 104 S.Ct. at 1560–61.) He further opines that any franchise that does not require specialized knowledge is a viable alternative to SpeeDee because the SpeeDee franchise does not require specialized knowledge to operate. (*Id.*) As to the geographic market, defendants' expert concludes that the relevant geographic market is national in scope as a result of franchisors' making themselves readily available to prospective franchisees all over the country. (*Id.* at 19–20, 104 S.Ct. at 1561–62.) This is facilitated through franchise fairs, franchise directories (which list hundreds of competing franchise companies), newspaper ads, magazine ads, and electronic directories on Internet websites. (*Id.*) Plaintiffs Elliot and Axtell testified that they became involved with SpeeDee through newspaper advertisements, Rizan discovered SpeeDee at a franchise show, and Gerhart saw SpeeDee advertised in a magazine. (*Id.*) Finally, defendants' expert opines that SpeeDee's market share for comparable franchises during the period 1988 through 1992 is less than 3.23%.

Defendants further assert that even if the market were defined more narrowly to include only quick lube franchises, data from the *National Oil and Lube News* indicate that SpeeDee's share of franchise sales in the

quick lube sector was equal to 11.6% between 1988 and 1992, while its share of quick lube outlets was 1% in 1988, which increased to 9.4% by 1996. Although plaintiffs disagree with defendants as to whether these markets are relevant, they have submitted no summary judgment evidence to refute SpeeDee's share of either the "all comparable franchises" market or the quick lube franchise market. In either case, the market shares are too trivial to permit the exercise of market power. *See Jefferson Parish District No. 2, supra.*

■ Plaintiffs claim that the relevant market should be limited to lubricant sales to the SpeeDee franchise network. Relying on *Kodak*, they claim that defendants' market share should not be measured at the time plaintiffs bought their franchises because plaintiffs suffered from high information costs that prevented them from evaluating the lifecycle price of the franchise before purchase and, once they became franchisees, they were "locked-in" because the costs of switching to another franchise were prohibitive.

Based on a review of the summary judgment evidence, the Court finds that plaintiffs' reliance on *Kodak* is misplaced. The Court discussed *Kodak* in detail in its prior opinion on defendants' motion to dismiss. However, a closer reading of *Kodak* suggests an important difference between that case and the facts presented here. In *Eastman Kodak Co.,* 504 U.S. at 458, 112 S.Ct. at 2077, Kodak implemented a change of policy to begin selling replacement parts for its equipment only to buyers who used Kodak's service or repaired their own machines. Before the change, Kodak allowed customers to obtain service from independent service providers. Kodak intended the new policies to make it more difficult for independent service organizations to sell service for Kodak machines. This enabled Kodak to force purchasers to buy service from Kodak at a higher cost, which purchasers could not have foreseen when they bought their machines. Significantly, Kodak had never tied the sale of equipment to the sale of service and parts. Rather, it charged, through negotiation, different prices for equipment, service and parts to different customers. Indeed, the Supreme Court appeared to accept the proposition advanced by the dissent that an up-front tie-in of equipment and service would not raise the same antitrust concerns. *See Eastman Kodak Co.,* 504 U.S. at 451 n. 24, 112 S.Ct. at 2087 n. 24. In this case, because the tie-in was imposed at the time the franchise was purchased, the proper analogy is between a tie-in of Kodak's equipment and the sale of parts and service, which was not the situation the Supreme Court found to implicate information cost asymmetries.

Moreover, there is growing circuit authority, which this Court cannot ignore, recognizing that the effect of advance disclosure of a tying arrangement is to prevent the purchaser from being locked-in. In *Digital Equip. Corp. v. Uniq Digital Technologies, Inc.,* 73 F.3d 756 (7th Cir.1996), for example, the Seventh Circuit stated that the Supreme Court "did not doubt in *Kodak* that if spare parts had been bundled with Kodak's copiers from the outset, or Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive life-cycle prices." 73 F.3d at 763. The Court characterized the triable issue in *Kodak* as "whether the *change in policy* enabled Kodak to extract supracompetitive prices from customers who had already purchased its machines." *Id.* (emphasis added). Similarly, in *Lee v. Life Ins. Co. of N. Am.,* 23 F.3d 14 (1st Cir.1994), the First Circuit held that "the timing of the 'lock-in' at issue in *Kodak* was central to the Supreme Court's decision." 23 F.3d at 20. This followed because unsophisticated Kodak copier owners "were destined for lock-in from the moment they purchased their Kodak copiers because at the time they purchased, Kodak had not yet conditioned its sale of replacement parts on the purchase of Kodak servicing." *Id.* Significantly, the First Circuit stated that "[h]ad previous owners known at the time they bought their Kodak copiers that Kodak would implement its restrictive parts-servicing policy, Kodak's 'market power,' *i.e.,* its leverage to induce customers to purchase Kodak servicing, could only have been as significant as its [market power] in the copier market, which was stipulated to be inconsequential or non-

existent." *Id.* Similarly, in *United Farmers Agents' Ass'n v. Farmers Ins. Exch.,* 89 F.3d 233 (5th Cir.1996), the Fifth Circuit found that when defendant's restrictive policy was disclosed in advance, information and switching costs were "virtually nonexistent." *Id.* at 238.

Finally, in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.* 124 F.3d 430 (3d Cir.1997), the Third Circuit recently rejected a franchise tie-in claim similar to the one advanced here.[2] In that case, Domino's franchisees challenged a franchise agreement under which Domino's Pizza, Inc. sold 90% of the ingredients and supplies used by the franchisees. The plaintiffs in that case sought to confine the relevant market to Domino's franchise system. However, the court emphasized that Domino's approved supplies and ingredients were fully interchangeable in all relevant respects with pizza supplies sold outside of Domino's system. The court found that this factor distinguished the case from *Kodak,* in which repair parts and service were unique to Kodak's machines. In addition, the court found *Kodak* distinguishable because "the *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repair policies." *Id.* 124 F.3d at 440. Because Kodak's change in policy was not foreseen at the time of sale, buyers had no ability to calculate the higher costs at the time of purchase and incorporate them into the purchasing decision. In contrast, the *Domino's* plaintiffs "knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement." *Id.* The court held that "unlike the plaintiffs in *Kodak,* the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement." *Id.* This was not true in *Kodak* because Kodak's conduct was not authorized by contract at the time of the original transaction. Kodak's sale of its product involved "no contractual framework for continuing relations with the purchaser." *Id.* The court found

these differences between *Kodak* and the franchise transactions before it "compelling." *Id.*

Several commentators have also contended that arguments about information costs and switching costs are inapposite in the franchise context if there is advance disclosure of the tying arrangement. *See, e.g.,* George A. Hay, *Is the Glass Half–Empty or Half–Full?: Reflections on the Kodak Case,* 62 Antitrust L.J. 177, 188 (Summer 1993) (noting that there are literally thousands of franchise opportunities available to prospective investors, that federal law operates to ensure that prospective investors are given information about the likely costs and revenues of a particular franchise opportunity, and there is nothing to prevent prospective franchisees from speaking with existing franchisees, who are likely to be vocal if they feel that the franchisor is taking advantage). Professor Areeda likewise noted that if the franchise agreement creates the tie-in, plaintiff is not locked-in to anything:

> [W]e should measure the tying seller's power at the time that the tie-in agreement came into existence. At that time, the franchisee has not yet invested the capital or effort that later makes him reluctant to abandon a franchise. Indeed, at that time, the plaintiff presumably had many market alternatives. He might have entered that line of business without a franchise ... obtained a different franchise in that line ... or sought a franchise in a different line suitable to his talents and interests. The plaintiff was not locked into anything at the time he entered the franchise agreement creating the alleged tie-in.

Areeda, Antitrust Law § 1709.

This Court's review of the evidence indicates that defendants' market power should be measured at the precontract stage because each plaintiff had sufficient information to evaluate the SpeeDee franchise opportunity before they "locked-in" to the franchise. Before signing their contracts, each potential

---

**2.** This Court declined to follow the district court's opinion in *Queen City* in its earlier decision on defendants' motion to dismiss largely because the *Queen City* court appeared to decide, as a matter of law, that *Kodak* issues could never arise in a franchise context.

franchisee knew that the franchise agreement was for fifteen years, there was a single approved brand of lubricants, that SpeeDee, not the franchisees, had the contractual authority to determine the number and identity of approved brands and/or suppliers, including lubricant brands and/or suppliers, and that if a franchisee chose to take advantage of equipment programs offered by the approved lubricant suppliers (Castrol and later Mobil), the franchisee must purchase certain amounts of product from the approved suppliers.[3] Thus, franchisees had sufficient information to conclude that they would be required to purchase from a single lubricant supplier indefinitely, that there was a possibility that SpeeDee's choice of supplier might differ from their own preferred choice, and that to take advantage of certain equipment packages, the franchisee would be required to buy specific volumes of lubricants each year from the approved suppliers. Three of the five plaintiffs joined the SpeeDee franchise system when Mobil was already the "oil of choice." Only Elliot and Axtell complained that SpeeDee changed from Castrol to Mobil after their UFOC's identified Castrol as the oil of choice. However, SpeeDee's right to select and change the oil of choice was disclosed to them, as was their obligation to purchase only approved brands of lubricants. The risk of being unhappy with the proposed oil of choice was disclosed, and plaintiffs have given no reason why they could not have shopped for another franchise if they found that risk unacceptable. Plaintiffs also complain about a lack of disclosure of current or future prices or the lack of market acceptance of the Mobil product brand. However, at the precontract stage, these plaintiffs were aware that prices for lubricants would vary, that the selection of the supplier was not theirs, and that if they accepted the equipment package they would be required to purchase specific volumes of lubricants from the designated supplier. These plaintiffs had sufficient information to determine whether this franchise opportunity was too risky to venture into and to compare it with other franchises. In addition, com-

pared to a copier purchaser who is only buying one piece of equipment, a person about to venture long-term into a new business should have a strong incentive to shop around and to determine if he needs more information to make a decision.

As noted, Wilson, Rizan and Gerhart became SpeeDee franchisees after Mobil was the oil of choice. Plaintiffs have not shown any evidence that information about Mobil's products or current prices was not available from other sources. The UFOC's provided to Wilson and Rizan specifically told franchisees to contact Mobil about its policies. These plaintiffs have suggested no reason why they could not have contacted Mobil, existing franchisees, or market sources about the pricing and desirability of Mobil's package. The offering circulars even listed names and addresses of other SpeeDee franchisees.

In summary, because plaintiffs had sufficient information to evaluate the risks of entering the SpeeDee franchise before they signed their agreements, Kodak-type information costs and switching costs are not present in this case. *Kodak* therefore does not provide a basis to narrow the relevant market to the SpeeDee franchise network. Plaintiffs concede that unless that can be achieved, defendants lack market power to impose a per se illegal tie-in.

### RULE OF REASON

■ Plaintiffs claim that there is a triable tying claim under the Rule of Reason because there is evidence that defendants raised prices and excluded competition in the tied product market. Under the Rule of Reason, the plaintiff has the burden of proving that the tying arrangement "unreasonably restrained competition," which requires an inquiry into the actual effect of the arrangement in the tied product market. *United Farmers Agents Ass'n,* 89 F.3d at 236 n. 2.

Plaintiffs' argument that defendants raised prices and drove out competition in the tied product market is flawed because they define

---

**3.** Milton Rizan contends that he received the UFOC and franchise contract on the day he signed his contract. Accepting this assertion as true, he still had the opportunity to learn the terms of the deal before he signed up as a SpeeDee franchisee and paid his money.

the tied product market as the sale of Mobil's own products. Even if Mobil raised its own prices, plaintiffs have failed to show that this conduct had any competitive significance. By failing to properly define the tied product market, plaintiffs have provided no reliable measure of what competitive prices were to determine whether Mobil's prices were supracompetitive. *See United Farmers Agents Ass'n*, 89 F.3d at 237 (distinguishing case from *Kodak* because *United Farmers* plaintiffs failed to produce evidence of what the market price was).

Further, defendants have proffered evidence of industry-wide bulk oil pricing during the period 1991 through 1994. *See* (Defs.' Mot. Summ. J., Exh. 5.) Defendants' expert analyzed the average cost per gallon of the highest volume-selling bulk oil reported by quick lube outlets for 1991 through 1994. His comparison revealed that Mobil's average price was less than the industry average in three of the four years. In 1991, Mobil's average price exceeded the industry average by only 1.2%, whereas it was below the industry average by 16.8%, 4.6%, and 18.7% in 1992, 1993 and 1994, respectively. Further, Mobil's price included the amortized value of plaintiffs' equipment loans, as well as penalties for failing to meet volume requirements.

■ Plaintiffs, on the other hand, have produced no systematic analysis of bulk oil pricing over the relevant time period. Plaintiffs instead point to an anecdote that a Castrol Oil salesman offered a better package at some point in time. (*See* Pls.' Mem. Opp. Defs. Mot. Summ. J., Exhs. 5 & 6.) However, as the Fifth Circuit noted in *Doctors Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 309 (5th Cir. 1997), evidence that defendant charged its customers higher prices than another company would have charged, does not, without more, demonstrate market injury. *Id.* The Fifth Circuit stated, "to demonstrate the potential for adverse effects in the market,

[plaintiff] is required to define the market and establish that defendants possessed market power." *Id.* Here, absent evidence that defendants had market power in any meaningfully defined market, or some direct evidence of pricing above *market* levels, plaintiffs' arguments about defendant's pricing are unavailing.[4]

Further, there is no evidence that Mobil excluded competition from any properly defined market. Even if Mobil threatened other suppliers not to interfere with its contracts with SpeeDee franchisees, this conduct is not the concern of the antitrust laws, unless it has an impact on a properly defined market. Plaintiffs' own complaint alleges that the SpeeDee franchise network is no more than 25% of the national fast lube market. (Complaint at ¶ 15.) Further, plaintiffs produced no evidence to dispute Mobil's showing that there were 146,266 establishments in the United States at which automotive lubricants could be purchased in 1992, of which SpeeDee franchise outlets made up only 133. (*See* Defs.' Mot. Summ. J., Exh. 5, at 22.) In addition, defendants produced evidence that SpeeDee outlets accounted for only 34 of the 22,395 establishments selling automotive lubricants in the states of Alabama, Louisiana, Texas and Mississippi, the four states in which plaintiffs operated. (*Id.* at 23.) SpeeDee outlets sold only 1.28% of the $362 million of automotive lubricants sold in the four-state region. (*Id.*) Thus, other sellers of automotive lubricants had many routes to reach consumers including service stations, quick lube franchises, company-owned quick lube outlets, automotive supply stores, grocery stores, pharmacies, and retailers like Wal–Mart, K–Mart and Pep Boys. (*Id.*) Indeed, plaintiffs themselves sold the products of competing suppliers. (*See* Defs.' Mot. Summ. J., Exh. 10, at 38 (plaintiff Rizan sold 30% of his volume of oil in non-Mobil products when he first opened, which later increased); *see also id.*, Exh. 12, at 85 (Wilson sold less than 10% Mobil products when his shop closed); *id.*, Exh. 6, at 71–73 (Elliot sold other brands to

---

4. Plaintiffs also rely on comparisons between prices for packaged Mobil motor oil sold at retail in California to consumers to prices for bulk oil sold by Mobil to SpeeDee franchisees. (*See* Pls.' Mem. Opp. Defs.' Mot. Summ. J., Exhs. 1, 3, 4, & 7.) Plaintiffs have produced no evidence of Mo-

bil's prices to retailers for packaged oil. Nor is it obvious that retail prices and bulk oil prices provide any meaningful point of comparison to determine whether Mobil's prices to plaintiffs were supracompetitive.

consumers).) In *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), the Fifth Circuit recognized that when a manufacturer is foreclosed from selling to a dealer because of a tying arrangement, competition is not adversely affected if the manufacturer will be likely to find another way to take its products to market. *Id.* In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. The same is true here. Since plaintiffs' tying claims fail to satisfy the legal requisites under either the per se rule or the Rule of Reason, summary judgment on these claims is warranted.

## STATE ANTITRUST CLAIMS

As the foregoing discussion demonstrates, plaintiffs do not have viable tying claims under federal antitrust laws. Federal antitrust precedent is persuasive authority for interpreting parallel provisions of Louisiana law in the absence of contrary state precedent. *See* La. R.S. 51:122 (counterpart to § 1 of the Sherman Act, 15 U.S.C. § 1). *See Giddens v. Shreveport,* 901 F.Supp. 1170 (W.D.La.1995); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So.2d 1149 (La.1986). Finding no contrary Louisiana state precedent, this Court finds that summary judgment on the state antitrust claims is warranted for the same reasons that it is warranted under federal law.

For all of the foregoing reasons, defendants' motion for summary judgment on plaintiffs' antitrust claims is GRANTED.