Window World of Baton Rouge, LLC v. Window World, Inc.; Window World of St. Louis, Inc. v. Window World, Inc., 2016 NCBC 80.

STATE OF NORTH CAROLINA

WILKES COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 1

WINDOW WORLD OF BATON
ROUGE, LLC; WINDOW WORLD
OF DALLAS, LLC; WINDOW
WORLD OF TRI STATE AREA, LLC;
and JAMES W. ROLAND,

        Plaintiffs,

v.

WINDOW WORLD, INC. and
WINDOW WORLD
INTERNATIONAL, LLC,

        Defendants.

WILKES COUNTY

15 CVS 2

WINDOW WORLD OF ST. LOUIS,
INC.; WINDOW WORLD OF
KANSAS CITY, INC.; WINDOW
WORLD OF
SPRINGFIELD/PEORIA, INC.;
JAMES T. LOMAX III; JONATHAN
GILLETTE; B&E INVESTORS, INC.;
WINDOW WORLD OF NORTH
ATLANTA, INC.; WINDOW WORLD
OF CENTRAL ALABAMA, INC.;
MICHAEL EDWARDS; MELISSA
EDWARDS; WINDOW WORLD OF
CENTRAL PA, LLC; ANGELL P.
WESNERFORD; KENNETH R.
FORD, JR.; WORLD OF WINDOWS
OF DENVER, LLC; RICK D. ROSE;
CHRISTINA M. ROSE; WINDOW
WORLD OF ROCKFORD, INC.;
WINDOW WORLD OF JOLIET,
INC.; SCOTT A. WILLIAMSON;
JENNIFER L. WILLIAMSON;
BRIAN C. HOPKINS; WINDOW
WORLD OF LEXINGTON, INC.;

TOMMY R. JONES; JEREMY T. SHUMATE; WINDOW WORLD OF PHOENIX LLC; JAMES BALLARD; and TONI BALLARD,

          Plaintiffs,

v.

WINDOW WORLD, INC. and WINDOW WORLD INTERNATIONAL, LLC,

          Defendants.

## ORDER AND OPINION ON DEFENDANTS' MOTION TO DISMISS AND SECOND MOTION FOR JUDGMENT ON THE PLEADINGS

1.     **THIS MATTER** is before the Court upon Defendants Window World, Inc. and Window World International, LLC's (collectively, "Window World" or "Defendants") Motion to Dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure in *Window World of Baton Rouge, LLC v. Window World, Inc.*, 15 CVS 1 (the "Roland Action"), and Defendants' Second Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the North Carolina Rules of Civil Procedure in *Window World of St. Louis, Inc. v. Window World, Inc.*, 15 CVS 2 (the "Lomax Action") (collectively, the "Motions").

2.     After considering the Motions, the briefs in support of and in opposition to the Motions, and the arguments of counsel at a hearing held on June 15, 2016, the Court hereby **GRANTS** both Motions and **DISMISSES** with prejudice Plaintiffs'[1]

---

[1] "Plaintiffs" herein means all plaintiffs in the Roland Action and the Lomax Action collectively: Window World of Baton Rouge, LLC; Window World of Dallas, LLC; Window World of Tri State Area, LLC; James W. Roland; Window World of St. Louis, Inc.; Window World of Kansas City, Inc.; Window World of Springfield/Peoria, Inc.; James T. Lomax III; Jonathan Gillette; B&E Investors, Inc.; Window World of North Atlanta, Inc.; Window World

Ninth Cause of Action in the Roland Action and Plaintiffs' Eleventh Cause of Action in the Lomax Action, each of which allege Defendants are liable to Plaintiffs for violation of N.C. Gen. Stat. § 75-1.

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Charles E. Coble, Benjamin R. Norman, Jeffrey E. Oleynik, and Andrew L. Rodenbough, and Keogh Cox & Wilson, Ltd, by John P. Wolff, III, for Plaintiffs Window World of Baton Rouge, LLC, Window World of Dallas, LLC, Window World of Tri State Area LLC, James W. Roland, Window World of St. Louis, Inc., Window World of Kansas City, Inc., Window World of Springfield/Peoria, Inc., James T. Lomax III, Jonathan Gillette, B&E Investors, Inc., Window World of North Atlanta, Inc., Window World of Central Alabama, Inc., Michael Edwards, Melissa Edwards, Window World of Central PA, LLC, Angell P. Wesnerford, Kenneth R. Ford, Jr., World of Windows of Denver, LLC, Rick D. Rose, Christina M. Rose, Window World of Rockford, Inc., Window World of Joliet, Inc., Scott A. Williamson, Jennifer L. Williamson, Brian C. Hopkins, Window World of Lexington, LLC, Tommy R. Johns, Jeremy T. Shumate, Window World of Phoenix LLC, James Ballard, and Toni Ballard.*

*Manning, Fulton & Skinner, P.A., by Michael T. Medford, Judson A. Welborn, Natalie M. Rice, Jessica B. Vickers, and Pia Anderson Dorius Reynard & Moss, by Mark M. Leitner, Joseph S. Goode, Travis James West, and Jessica L. Farley, for Defendants Window World, Inc. and Window World International, LLC.*

Bledsoe, Judge.

I.

INTRODUCTION

3. As pleaded here, this case involves a dispute between Window World, a franchisor of its own brand of vinyl replacement windows, doors, and related

---

of Central Alabama, Inc.; Michael Edwards; Melissa Edwards; Window World of Central PA, LLC; Angell P. Wesnerford; Kenneth R. Ford, Jr.; World of Windows of Denver, LLC; Rick D. Rose; Christina M. Rose; Window World of Rockford, Inc.; Window World of Joliet, Inc.; Scott A. Williamson; Jennifer L. Williamson; Brian C. Hopkins; Window World of Lexington, Inc.; Tommy R. Jones; Jeremy T. Shumate; Window World of Phoenix LLC; James Ballard; and Toni Ballard.

materials, and Plaintiffs, who are various Window World franchisees around the United States. Plaintiffs filed these two lawsuits in 2015, alleging that Window World knowingly and intentionally withheld information from Plaintiffs that Plaintiffs allege they were entitled to receive under federal franchise law. Particularly relevant to these Motions, Plaintiffs allege that Window World misrepresented a key fact on which the franchise relationships were formed—that by becoming a licensee of the Window World marks, each Plaintiff would gain access to the lowest available wholesale prices for the Window World windows, doors, and related materials Plaintiffs sold and installed.

4. Plaintiffs' Second Amended Complaint in each action alleges various causes of action against Window World for declaratory judgment, reformation, injunction, breach of contract, fraud, negligent misrepresentation, violation of N.C. Gen. Stat. §§ 75-1 and 75-1.1, unjust enrichment, and fraudulent transfer. Plaintiffs seek over $5 million in damages in each action.

5. Defendants' Motions seek dismissal of a single claim in each Second Amended Complaint: Plaintiffs' claim against Defendants for an illegal combination in restraint of trade in violation of N.C. Gen. Stat. § 75-1. Defendants argue that Plaintiffs' Second Amended Complaint in each action fails to allege facts sufficient to establish necessary elements under section 75-1, including (i) the identity of a relevant market, (ii) that Window World has sufficient market power in the relevant market, (iii) that Window World's conduct had an anticompetitive effect, and (iv) that Plaintiffs suffered antitrust injury. The allegations relevant to the determination of

the Motions are substantially similar in each of Plaintiffs' Second Amended Complaints.

## II.

## PROCEDURAL AND FACTUAL BACKGROUND

6. The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6) or on motions for judgment on the pleadings under Rule 12(c), but only recites those facts included in each Second Amended Complaint that are relevant to the Court's determination of the Motions. *See, e.g.*, *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986).

7. According to Plaintiffs, Window World is a North Carolina franchisor that operates a network of approximately 200 franchises across the United States that includes Plaintiffs' franchises. (Second Am. Compl., 15 CVS 1, hereafter, "Roland SAC," ¶¶ 15, 19, 22; Second Am. Compl., 15 CVS 2, hereafter, "Lomax SAC," ¶¶ 50, 54.)

8. Plaintiffs and other Window World franchisees purchase vinyl replacement windows, doors and siding, related accessories, and other Window World-trademarked items from Window World's approved vendors. (Roland SAC ¶¶ 19, 24; Lomax SAC ¶¶ 54, 59.) The franchisees then resell to, and install the products for, customers. (Roland SAC ¶¶ 19, 24; Lomax SAC ¶¶ 54, 59.)

9. Each of Window World's multiple franchisees is assigned an exclusive geographic area. (Roland SAC ¶¶ 30, 31, 35, 36; Lomax SAC ¶¶ 65–95.) Plaintiffs

are long-standing Window World franchisees and sell Window World-trademarked products in different parts of the United States. (Roland SAC ¶ 2; Lomax SAC ¶ 2.)

10. In addition to providing the right to use the Window World trademarks, Window World endeavors to use the bargaining power created by its network of franchisees to negotiate with Window World's approved vendors to provide lower prices to its franchisees for Window World-trademarked products. (Roland SAC ¶¶ 98, 99, 102; Lomax SAC ¶¶ 187, 188, 197.) Window World has historically charged its franchisees a modest upfront franchise fee when the franchisee acquired its franchise. (Roland SAC ¶¶ 30, 32, 36; Lomax SAC ¶¶ 65, 74, 75, 81, 82, 83, 90, 91, 93, 95.) Instead of collecting royalties directly from franchisees on their sales of Window World-trademarked items, Window World collects its royalties through the approved vendors as a percentage of the sales price of Window World items sold by these vendors. (Roland SAC ¶ 68; Lomax SAC ¶ 160.)

11. Plaintiffs allege that these payments from approved vendors are in the form of "kickbacks" or "rebates" and were not disclosed to Plaintiffs until soon before Plaintiffs initiated these lawsuits. (Roland ¶ 68; Lomax SAC ¶ 160.) Plaintiffs further allege that these payments supplied nearly all of the revenue that Window World has collected in the course of its franchising business over the time period relevant to this dispute. (Roland ¶ 68; Lomax SAC ¶ 160.)

12. According to Plaintiffs, since as early as 2002, Window World has consistently represented to Plaintiffs that participation in the Window World franchisee network would allow Plaintiffs to receive the lowest available wholesale

pricing for Window World-trademarked products. (Roland ¶ 72, Lomax SAC ¶ 164.) As stated in the typical Window World licensing agreement with its franchisees, Window World "shall endeavor to arrange for the supply of the items to LICENSEE at prices which are less than those charged to non-licensees within the trade area herein defined."[2] (Roland SAC ¶ 102; Lomax SAC ¶ 197; Defs.' Mot. Dismiss Exs. A, B, C, D § 4.)

13.    The licensing agreements also required, however, that Plaintiffs agree to "sell and install **only and exclusively** those products, goods, equipment, and parts from vendors approved by [Window World]." (Defs.' Mot. Dismiss Exs. A, B, C, D § 4) (emphasis in original). Nonetheless, Plaintiffs allege that "the parties' business relationship existed independent of those written agreements, predated the execution of those written agreements, continued unabated and unaltered after the expiration of those written agreements, and was not limited by those written agreements." (Roland SAC ¶ 29; Lomax SAC ¶ 64.)

14.    Since at least 2000, Associated Materials, LLC ("AMI") has served as a Window World-approved supplier of vinyl replacement windows to Window World franchisees. (Roland SAC ¶ 24; Lomax SAC ¶ 59.) In 2007, Window World announced to its franchisees that it would be moving to AMI as the "sole source" supplier of windows within the Window World franchise network. (Roland SAC ¶ 137; Lomax SAC ¶ 159.)

---

[2] These documents were not attached to Plaintiffs' Second Amended Complaints, but were referred to therein, and Window World has attached the referenced documents to its Motions. As a result, the Court may properly consider such documents in resolving the Motions. *See, e.g., Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

15. Plaintiffs allege that Window World unlawfully conspired with AMI to require Window World franchisees to purchase only from AMI, to inflate the prices Window World franchisees, including Plaintiffs, were required to pay to AMI, and therefore to increase the revenue that Window World collected from each purchase its franchisees made from AMI. (Roland ¶ 134; Lomax SAC ¶ 230.) Plaintiffs allege that these actions harmed competition and injured Window World franchisees, including Plaintiffs. (Roland SAC ¶ 138; Lomax SAC ¶ 234.)

16. Plaintiffs further allege that Window World has failed to meet its commitment to secure superior wholesale pricing for its franchisees. In addition, Plaintiffs allege that the amounts Plaintiffs have paid to AMI exceed the amounts they would otherwise have paid to AMI or other suppliers of comparable products in the relevant markets were they not Window World franchisees. (Roland SAC ¶ 106; Lomax SAC ¶ 201.) Plaintiffs also contend that they have been required to pay above-market prices for vinyl replacement windows and for various other products, including caulk, doors, siding, and garage doors. (Roland SAC ¶ 111; Lomax SAC ¶ 206.)

17. Plaintiffs assert that these actions and other allegedly wrongful conduct by Window World motivated Plaintiffs to file these actions on January 2, 2015. Since the filing of the lawsuits, the parties have engaged in pretrial motions practice as well as voluminous discovery, none of which is relevant for the resolution of the current Motions, which is based solely on an examination of the allegations of each Second Amended Complaint.

18. Plaintiffs filed the Second Amended Complaint in the Lomax Action on September 8, 2015, and the Second Amended Complaint in the Roland Action on March 22, 2016. On April 25, 2016, Window World filed its Motion to Dismiss in the Roland Action and its Motion for Judgment on the Pleadings in the Lomax Action. The Motions have been fully briefed, the Court held a hearing on the Motions on June 15, 2016, and the Motions are now ripe for resolution.

III.

LEGAL STANDARD

19. In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, the Court reviews the allegations of the operative complaint in the light most favorable to the plaintiff. The Court's inquiry here is "whether, as a matter of law, the allegations of the [Second Amended Complaint in the Roland Action], treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Second Amended Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

20. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the plaintiff's claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also*

*Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

21. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862.

22. The standard for a motion for judgment on the pleadings under Rule 12(c) is similar. "'A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant[.]'" *Bigelow v. Town of Chapel Hill*, 227 N.C. App. 1, 3, 745 S.E.2d 316, 319 (2013) (quoting *George Shinn Sports, Inc. v. Bahakel Sports, Inc.*, 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990)). The Court must "view the facts and permissible inferences in the light most favorable to the nonmoving party." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). Thus, Defendants' Rule 12(c) motion for judgment on the pleadings in the Lomax Action should be denied "unless it is clear that [Plaintiffs are] not entitled to any relief under

any statement of the facts." *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC LEXIS 5, at *8 (N.C. Super. Ct. May 26, 1999).

IV.

ANALYSIS

23.     N.C. Gen. Stat. § 75-1 makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina."  Our Supreme Court has directed trial courts that "the body of law applying the [federal] Sherman Act, although not binding upon this Court in applying [section] 75-1, is nonetheless instructive in determining the full reach of that statute." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 655, 194 S.E.2d 521, 530 (1973).

24.     Restraints of trade, which section 75-1 makes illegal, are most often evaluated under the rule of reason. *See, e.g.*, *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 708–09 (4th Cir. 1991).  "Under the rule of reason, [a plaintiff] bears the burden of proving that the actions of the defendants have unreasonably restrained trade." *Id.* at 709.  In order to meet this burden, a plaintiff must show that a defendant has market power[3] by showing "what market [the plaintiff] contends was restrained and that the defendants played a significant role in the relevant market." *Id.*  The

---

[3] Market power has been defined as the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984).  It is "'the ability to raise prices above those that would be charged in a competitive market'" and "is usually demonstrated by a defendant's 'dominant market share in a well-defined market.'" *Carolina Rest. Group, Inc. v. Pepsico Sales, Inc.*, No. 3:14-CV-668, 2015 U.S. Dist. LEXIS 90598, at *18 (W.D.N.C. July 13, 2015) (quoting *Flegel v. Christian Hosp.*, 4 F.3d 682, 688–89 (8th Cir. 1993)).

"purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986). Courts have observed that "[a]ntitrust claims often rise or fall on the definition of the relevant market." *Bathke v. Casey's Gen. Stores*, 64 F.3d 340, 345 (8th Cir. 1995).

25. Window World thus contends that in order to state a valid claim under section 75-1, Plaintiffs must allege facts sufficient to show that Window World had market power in a valid and relevant market. Plaintiffs concede that federal case law interpreting the Sherman Act is instructive in interpreting section 75-1, but nonetheless argue that no North Carolina state court has required market power to be specifically pleaded in order to withstand 12(b)(6) dismissal. Therefore, Plaintiffs contend, even if they have not sufficiently pleaded market power, Plaintiffs' section 75-1 claim should not be dismissed on that basis alone.

26. The Court finds this argument without merit. As explained above, our Supreme Court has stated that federal decisions are instructive in interpreting section 75-1. *Rose*, 282 N.C. at 655, 194 S.E.2d at 530. Moreover, this Court (Gale, J.) has recently looked to federal case law in dismissing a section 75-1 claim for failure to plead sufficiently a relevant product market or market power. *See SiteLink Software LLC v. Red Nova Labs, Inc.*, 2016 NCBC LEXIS 45 (N.C. Super. Ct. June 14, 2016). Indeed, in 1995, the North Carolina General Assembly amended certain provisions of North Carolina's antitrust laws, and titled such revision "An Act to Revise the Statutes Regarding Antitrust Law to Ensure that These Provisions Are . . .

Consistent with Federal Antitrust Laws." *See* 1995 N.C. Sess. Laws 550. Plaintiffs have cited no North Carolina case inconsistent with the federal case law relied upon by both Window World and Plaintiffs in arguing the Motions. Thus, the Court looks to federal case law interpreting the Sherman Act, 15 U.S.C. § 1, in resolving the current Motions.

27. Nevertheless, the Court is mindful that Window World's Motions must be resolved under North Carolina's more indulgent Rule 12(b)(6) standard rather than the more exacting plausibility standard under federal Rule 12(b)(6) that governs the federal cases that the parties cite in their briefs and that the Court relies on here. *Compare Sutton*, 277 N.C. at 104, 176 S.E.2d at 167 (noting that a pleading complies with North Carolina's standard if it gives sufficient notice of the events underlying the claims), *with Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (requiring that a complaint must state a plausible claim); *see SiteLink*, 2016 NCBC LEXIS 45, at *17 (noting the difference between the federal and North Carolina Rule 12(b)(6) standards in the context of evaluating federal antitrust precedents).

28. Despite the broad nature of the antitrust-related allegations in the Second Amended Complaints, it has become clear through the parties' briefing and argument that Plaintiffs are asserting a "lock-in" theory of antitrust liability under section 75-1. Plaintiffs' claim is not that Window World exercised market power in the broad market for windows and related accessories by enjoying a dominant market share in particular geographic regions of the United States. Rather, the gravamen of Plaintiffs' claim is that Window World exercised market power over its franchisees

by locking them into franchise agreements and then imposing unilaterally a sole-supplier requirement that the "locked in" franchisees could not have anticipated before entering into their franchise agreements. Window World argues, however, that Plaintiffs' Second Amended Complaints fail to define a valid relevant market and, additionally, fail to allege that Window World had market power in the relevant market, such that Plaintiffs' claim must fail in each action.

29. As noted above, "Plaintiffs have the burden of defining the relevant market." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997). Generally, a relevant market is defined:

> by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id.* Courts have also held that a "relevant market has both a product and a geographic dimension," *Carolina Rest. Group, Inc.*, 2015 U.S. Dist. LEXIS 90598, at *17, and have defined the relevant geographic market as "'the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Id.* at *18 (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359 (1963)).

30. Window World argues that Plaintiffs' section 75-1 claim here must be dismissed because Plaintiffs do not, and cannot, allege that interchangeable substitutes do not exist in the relevant market and further because the relevant

market cannot be restricted to a single franchisor or its products, as Plaintiffs contend is appropriate here. Window World relies, in particular, on the Third Circuit's decision in *Queen City Pizza*, which held that "the relevant market . . . cannot be restricted solely to those products currently approved by [the franchisor] for use by [the] franchisees" and therefore "reject[ed] plaintiffs' proposed relevant market." *Id.* at 438.

31. *Queen City Pizza* explains that "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff [or plaintiffs] when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Queen City Pizza*, 124 F.3d at 438. Thus, analogizing *Queen City Pizza* to the present case, the Third Circuit posits that "the relevant inquiry here is not whether a [Window World] franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether [window resellers and installers] in general might use such products interchangeably." *Id.* Window World argues that the Third Circuit's conclusion in *Queen City Pizza* that approved and non-approved products could be used interchangeably applies equally here and that Plaintiffs have not pleaded otherwise. (Defs.' Br. Supp. Disp. Mots. 18–19.)

32. Notwithstanding the above, Plaintiffs argue that they have defined, based on a "lock-in" theory of antitrust liability, a valid relevant market, in particular, "the market formed by the large group of Window World franchisees." (Pls.' Br. Opp. Defs.'

Disp. Mots. 6.) The lock-in theory stems from the United States Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992). In that case, the defendant, Kodak, was a manufacturer and seller of photocopiers, and also sold service and replacement parts for its equipment. The plaintiffs were eighteen independent service organizations ("ISOs") that repaired and serviced Kodak equipment at prices substantially lower than Kodak's prices. Kodak eventually implemented a policy of selling replacement parts for their machines only to buyers of Kodak equipment who used Kodak service or who repaired their own machines, thus reducing the ISOs' access to the replacement parts they needed to provide service to Kodak machines. Kodak also took steps to limit ISO access to other sources of Kodak parts.

33. This policy succeeded in making it more difficult for the ISOs to sell service for Kodak machines, and many ISOs were forced out of business or lost substantial revenue. Customers were also forced to pay higher prices for Kodak service rather than the lower prices offered by the ISOs. Eventually, the ISOs sued Kodak for federal antitrust violations, alleging that Kodak's policies limiting the availability of parts to the ISOs made it more difficult for those ISOs to compete with Kodak in servicing Kodak equipment. The Supreme Court upheld the denial of Kodak's motion for summary judgment, holding that there was a triable issue of fact as to the availability of interchangeable substitutes for Kodak replacement parts and service in the market.

34.     In so holding, the Supreme Court recognized the general rule that "[t]he relevant market for antitrust purposes is determined by the choices available to Kodak equipment owners." *Id.* at 482.  The Court concluded, however, that "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines." *Id.*

35.     Further, in upholding the denial of Kodak's motion for summary judgment, the Supreme Court considered it important that high switching costs, such as where a consumer has purchased an expensive piece of copying equipment, could force the consumer to pay supracompetitive prices in the services aftermarket for replacement parts, observing that a "locked in" consumer will likely tolerate some level of price increases before switching brands.  *See Kodak*, 504 U.S. at 476.  Thus, the Court concluded, it was reasonable to infer that Kodak had market power to raise prices and drive out competition in the aftermarkets of service and repair.

36.     *Kodak* did not, however, involve a franchise network like that alleged to exist here.  In *Queen City Pizza*, the Third Circuit considered the *Kodak* decision in, and distinguished it from, the franchise context.  *Queen City Pizza* involved Domino's Pizza, which operated in large measure at that time through a network of approximately 3,500 franchisees around the United States.  The plaintiffs were Domino's franchisees who alleged that Domino's had restricted their ability to purchase competitively priced dough and other ingredients by making it practically

impossible for franchisees to obtain ingredients from another source, or to manufacture the ingredients themselves, at more favorable prices. The plaintiffs defined the relevant market as the market for ingredients and supplies among Domino's franchisees.

37. In considering the applicability of *Kodak* to the franchise context, the Third Circuit concluded that "*Kodak* does not hold that the existence of information and switching costs alone, such as those faced by the Domino's franchisees, renders an otherwise invalid relevant market valid." 124 F.3d at 439. In determining that *Kodak* was distinguishable from the typical franchise situation, the Third Circuit noted that, in *Kodak*, there was a "change in policy [that] was not foreseen at the time of sale, [thus] buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision." *Id.* at 440.

38. In contrast, the plaintiffs in *Queen City Pizza*:

> knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement. Unlike the plaintiffs in *Kodak*, the Domino's franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement. The franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage. That cannot be said of the conduct challenged in *Kodak* because it was not authorized by contract terms disclosed at the time of the original transaction. Kodak's sale of its product involved no contractual framework for continuing relations with the purchaser. But a franchise agreement regulating supplies, inspections, and quality standards structures an ongoing relationship between franchisor and franchisee designed to maintain good will. *These differences between the* Kodak *transaction and franchise transactions are compelling.*

*Id.* (emphasis added). The Court therefore concluded that "Domino's does not sell a unique product or service" and further that "[f]ranchisees must buy Domino's-

approved supplies and ingredients not because they are unique, but because they are obligated by contract to do so." *Id.* As such, the Third Circuit concluded that Domino's did not exercise market power in a relevant market sufficient to state a violation of the Sherman Act. *Id.* at 441.

39. Accordingly, the Third Circuit concluded in *Queen City Pizza* that the franchisor's disclosures to franchisees through the franchise agreement are critical in assessing whether the franchisees could have anticipated the franchisor's conduct and thus whether the franchisees should have relief from any resulting "locked in" franchise arrangement. *Id.* at 440. Significantly for that case, Domino's' standard franchise agreement expressly provided that Domino's "may in our sole discretion require that ingredients, supplies and materials used in the preparation, packaging, and delivery of pizza be purchased exclusively from us or from approved suppliers or distributors." *Id.* at 433. The Third Circuit concluded that this provision clearly put franchisees on notice that Domino's retained control over the approval of suppliers such that the franchisees had the ability to assess the costs and economic risks of entering into a franchise agreement with Domino's before they entered the franchise relationship. *Id.* at 440.

40. Since *Kodak* and *Queen City Pizza* were decided, numerous federal courts evaluating *Kodak*-type, lock-in based, antitrust claims in the franchise context have looked to the specific language of the parties' franchise agreement to determine whether the franchisor effected an unforeseen change in policy after the franchisee entered into the franchise agreement that prevented the franchisee from evaluating

the economic costs and risks of the franchise prior to entry. If so, courts have generally allowed claims under the Sherman Act to survive; if not, federal courts have not hesitated to dismiss a franchisee's claims under the Sherman Act. *See, e.g.*, *George Lussier Enters. v. Subaru of New Eng., Inc.*, 286 F. Supp. 2d 86, 100 (D.N.H. 2003) (since *Kodak*, "the prevailing view is that a contractual lock-in ordinarily does not give rise to concerns that the antitrust laws were enacted to address").

41. For example, in *Burda v. Wendy's International, Inc.*, 659 F. Supp. 2d 928 (S.D. Ohio 2009), the plaintiff became a Wendy's franchisee in 1996 and signed a franchise agreement that provided, in relevant part, as follows:

> Franchisee shall purchase all food items, ingredients, supplies, materials, and other products used or offered for sale at the Restaurant solely from suppliers (including manufacturers, distributors, and other sources) who demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's then-current standards and specifications for such items; who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; and who have been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. If Franchisee desires to purchase any products from an unapproved supplier, Franchisee shall submit to Franchisor a written request for such approval. Franchisee shall not purchase from any supplier until, and unless, such supplier has been approved in writing by Franchisor.

*Id.* at 931.

42. When the plaintiff in *Burda* first acquired his franchise, there were a number of Wendy's-approved food suppliers from which the franchisees could purchase needed supplies. Prior to 1997, the plaintiff purchased hamburger buns from an approved supplier, LePage Bakery. In 1997, Wendy's eliminated LePage Bakery as an approved supplier and insisted that the plaintiff change bun suppliers

and purchase all buns thereafter from New Bakery, which was a subsidiary of Wendy's. Plaintiff alleged that he had no knowledge of a potential obligation to buy buns from New Bakery when he became a franchisee, and therefore, he had no means of incorporating the costs of the New Bakery buns into his calculation of the potential financial return on his contemplated investment in a Wendy's franchise prior to making his investment. Wendy's, on the other hand, contended that the possibility of a sole supplier requirement was specifically set forth in the franchise agreement and, therefore, that the plaintiff knew, before becoming a Wendy's franchisee, that Wendy's could require the plaintiff to purchase some essential items, like hamburger buns, from a particular vendor.

43. The district court concluded that

> [t]here is no language in [the franchise agreement] that would put a potential franchisee on notice that [Wendy's] would be able to eliminate all competition by naming an exclusive supplier or that they could impose a surcharge on approved suppliers. Instead, the language suggests that supplier competition was welcome so long as prospective suppliers met [Wendy's] "standards and specifications," and "possess[ed] adequate quality controls and capacity to supply [the plaintiff's] needs."

*Id.* at 935–36. Accordingly, the court held that the appointment of an exclusive bun supplier constituted a "change of policy" that had not been disclosed to the franchisee plaintiff and that therefore plaintiff had stated a claim under the federal antitrust laws. *Id.* at 936.

44. In contrast, in *Wilson v. Mobil Oil Corp.*, 984 F. Supp. 450 (E.D. La. 1997), the plaintiffs, franchisees of SpeeDee Oil Change Systems, Inc., alleged that defendants' refusal to permit plaintiffs to purchase automotive supplies from vendors

other than Mobil Oil Corporation resulted in their paying supracompetitive prices for these required products. Each of the franchisees signed substantially similar franchise agreements, with each agreement containing a provision that the "[f]ranchisor . . . reserves the right to require that the [franchisees] purchase and use specific brand name items to be used in the operation of the franchise." The agreements also specifically designated certain companies, including Mobil, as the exclusive lubricant suppliers to the franchisees. *See id.* at 453–54.

46. In granting summary judgment for the defendants, the federal district court concluded that SpeeDee could not have had market power in the relevant market—defined here as the SpeeDee franchise network—because the plaintiffs "had sufficient information to evaluate the SpeeDee franchise opportunity before they 'locked-in' to the franchise." *Id.* at 461. Relying on *Queen City Pizza* and other similar cases from the federal courts, the district court concluded that "the effect of advance disclosure of a tying arrangement is to prevent the purchaser from being locked-in." *Id.* at 459. The court further held that "arguments about information costs and switching costs are inapposite in the franchise context if there is advance disclosure of the tying arrangement." *Id.* at 460 (citing several commentators).

46. In the instant case, Plaintiffs allege that Window World's arrangement with AMI as its sole source supplier "locked in place a substantial volume of purchasers at a fixed price, while preventing them from seeking alternative suppliers" and thus violated section 75-1. (Roland SAC ¶ 141; Lomax SAC ¶ 237.) The Court disagrees.

47. Here, the Window World licensing agreements explicitly provided that the "LICENSEE expressly agrees that it will sell and install **only and exclusively** those products, goods, equipment, and parts from vendors approved by [Window World]." (*E.g.*, Defs.' Mot. Dismiss Ex. A § 4.) The Court finds that this provision, like the provisions at issue in the franchise agreements in *Queen City Pizza* and *Wilson*, clearly put franchisees on notice that the franchisor, Window World, retained the authority to require the franchisees to purchase products from only a vendor that Window World had approved. *See Queen City Pizza*, 124 F.3d at 433; *Wilson*, 984 F. Supp. at 461. As such, the Court is not persuaded that Plaintiffs were locked in to an arrangement that would allow Window World to raise the prices of its Window World-trademarked windows to artificially high levels, as Plaintiffs contend. *See Queen City Pizza*, 124 F.3d at 440 (explaining that, unlike in *Kodak*, where the conduct challenged "was not authorized by contract terms disclosed at the time of the original transaction," the franchise transaction at issue here "was subjected to competition at the pre-contract stage"); *Wilson*, 984 F. Supp. at 459 ("[T]he effect of advance disclosure of a tying arrangement is to prevent the purchaser from being locked-in.") and *compare Burda*, 659 F. Supp. 2d at 937 (rejecting 12(b)(6) challenge because plaintiffs "could not have reasonably anticipated being required to purchase buns and food supplies from exclusive suppliers.").

48. To the contrary, like the Third Circuit in *Queen City Pizza*, the Court concludes here that, based on the language of the Window World licensing agreements, Plaintiffs were able to anticipate that Window World might move to a

sole source supplier, which it ultimately did. *See Queen City Pizza*, 124 F.3d at 440 ("[P]laintiffs here knew that Domino's . . . retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement."). If, as Plaintiffs contend, they were locked in to purchasing from a sole supplier here, the Court concludes that this was the result of the specific terms of the licensing agreements, not because of Window World's purported market power. *See Wilson*, 984 F. Supp. at 460 ("[I]f the franchise agreement creates the tie-in, plaintiff is not locked-in to anything.").

49. The Court does not find Plaintiffs' additional arguments in opposition persuasive. First, Plaintiffs contend that the use of the word "vendors" in the licensing agreements, rather than the singular term "vendor," failed to put Plaintiffs on notice that Window World might approve only a single vendor from which Plaintiffs could purchase products. The Court concludes, however, that the specific use of the plural term "vendors" here cannot be interpreted as a requirement for a particular number of vendors or a guarantee that there would always be at least two vendors, but rather simply that Window World retained the authority to approve any vendor that sold Window World-trademarked products to Plaintiffs and other franchisees. *See generally* N.C. Gen. Stat. § 12-3(1) (providing a rule of statutory construction in North Carolina that "every word importing the plural number only shall extend and be applied to one person or thing, as well as to several persons or

things"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 14 (2012) (noting that use of the plural includes the singular).[4]

50.     Plaintiffs also attempt to avoid the effect of the licensing agreements' plain language by contending in conclusory fashion that they "entered into a regular, definite, and consistent course of dealings establishing a business relationship" between Plaintiffs and Window World that "existed independent of" and "was not limited by" the written licensing agreements. (Roland SAC ¶ 29; Lomax SAC ¶ 64.) Plaintiffs' conclusory allegations, however, without supporting factual allegations, are insufficient to withstand Defendants' Motion. *See, e.g.*, *Estate of Vaughn v. Pike Elec., LLC*, 230 N.C. App. 485, 493, 751 S.E.2d 227, 233 (2013) ("On a motion to dismiss under Rule 12(b)(6), the court is not . . . required to accept mere conclusory allegations, unwarranted deductions of fact, or unreasonable inferences as true."); *Global Promotions Grp., Inc. v. Danas Inc.*, 2012 NCBC LEXIS 40, at *12 (N.C. Super. Ct. June 22, 2012) ("Absent specific, supportive, factual allegations, the court need not accept as true general conclusory allegations of the elements of a cause of action for purposes of a motion to dismiss."); *see also Livingston v. Bakewell*, No. COA13-

---

[4]     Although not raised by either party, the Court acknowledges that it has previously concluded in *Pro-Tech Energy Solutions, LLC v. Cooper*, 2015 NCBC LEXIS 76 (N.C. Super. Ct. July 30, 2015), that the plural term "Managers," as used in the LLC operating agreement at issue in that case, did not include the singular term "Manager" as a matter of law, *id.* at *18, which might appear in conflict with the Court's conclusion here. In the *Pro-Tech* case, however, the singular form "Manager" and the plural form "Managers" were each used elsewhere in the Operating Agreement, which strongly supported the interpretation that "Managers" and "Manager" were intended to have different meanings. In the licensing agreements at issue here, however, there is no use of the singular form "vendor"—only the plural form "vendors"—which, as used here, plainly suggests that the term "vendors" was not intended to exclude Window World's approval of only a single vendor.

748, 2014 N.C. App. LEXIS 141, at *15 (N.C. Ct. App. 2014) (unpublished) ("By not providing some factual foundation for these conclusory allegations, plaintiff's complaint, on its face, is insufficient to defeat defendants' motion to dismiss.").

51. The Court also finds unpersuasive Plaintiffs' reliance on *Burda* and two additional federal district court cases Plaintiffs advance in opposition to the Motions, *Collins v. International Dairy Queen*, 980 F. Supp. 1252 (M.D. Ga. 1997) and *Little Caesar Enterprises, Inc. v. Smith*, Nos. 93-CV-40521-FL, 96-CV-40254-FL, 1998 U.S. Dist. LEXIS 22039 (E.D. Mich. Sep. 30, 1998).

52. In *Burda*, as noted above, the court found it significant that the franchise agreement included language that "supplier competition was welcome so long as prospective suppliers met [Wendy's] 'standards and specifications,' and 'possess[ed] adequate quality controls and capacity to supply [the plaintiff's] needs." *Burda*, 659 F. Supp. 2d at 935–36. Indeed, the franchise agreement specifically provided a mechanism for Wendy's franchisees to request Wendy's' approval of previously unapproved suppliers. The court concluded that this language created an expectation that Wendy's would not unilaterally approve only a single supplier. *Id.* The language in the licensing agreements at issue here is far different, makes clear that Window World franchisees would not be able to choose their own suppliers, and vests sole approval authority for all vendors in Window World.

53. In *Collins*, the plaintiffs were Dairy Queen franchisees who alleged that Dairy Queen controlled the process of approving alternative suppliers through its franchise agreements. The franchise agreement at issue specifically required Dairy

Queen "to consider requests of [franchisees] for approval of specific alternate sources of supply and to cooperate with [franchisees] in this regard." *Collins*, 980 F. Supp. at 1259. The agreement also explicitly provided that "neither Franchisor nor any of its affiliates are the only approved suppliers of any goods, services, [or] supplies . . . relating to the establishment or operation of the franchised business." *Id.* The plaintiffs alleged that the franchise agreement failed to put the plaintiffs on notice that Dairy Queen would not authorize certain alternative products and suppliers, as it was alleged to have done.

54. Faced with this franchise agreement language, the federal district court determined that there was "a triable issue of fact" whether the effect of this language was to cause the franchisees to be "locked in to the existing arrangement." *Id.* The language in the Dairy Queen franchise agreement, however, is far less clear and decidedly more ambiguous than the plain directive in the licensing agreements in this case that the franchisees will "sell and install **only and exclusively** those products, goods, equipment, and parts from vendors approved by [Window World]." Moreover, the Eleventh Circuit, in *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002), considered and rejected the district court's holding in *Collins*, concluding in that case that:

> [t]he fact that [the franchisor] had considerable power over many aspects of [the plaintiff's] business by virtue of the provisions of the contract to which they agreed . . . reveals little about the issue of whether [the franchisor] had market power in the broader, relevant market for the purchase and sale of equity ownership interests in beer distributorships.

*Id.* at 1222.

55. Plaintiffs also rely on *Little Caesar*. There, the plaintiffs were Little Caesar's franchisees who alleged that "Little Caesar Enterprises made promises [in the franchise agreement] to approve alternate distributors," and by thereafter denying approval of an alternate distributor, "changed its position" and "force[d] [the franchisees] to purchase the tied product of the foods and other goods necessary to operate their franchises." *Little Caesar*, 1998 U.S. Dist. LEXIS 22039, at *55–58. *Little Caesar* is distinguishable, however, because the Court has concluded that the language in the licensing agreements here permitted Window World to select AMI as a sole source supplier, and, thus, Window World's selection of AMI did not reflect a change in position as did the franchisor's action in *Little Caesar*.

56. In sum, the Court concludes that the licensing agreements at issue here are unambiguous and made clear to Plaintiffs and other Window World franchisees at the time they entered into the agreements that Plaintiffs would be required to purchase exclusively from approved vendors, which came to include AMI. The agreements did not promise that Window World would approve a specific or minimum number of vendors or preclude Window World from approving a single supplier such as AMI. The Court thus concludes that Window World's requirement that Plaintiffs purchase Window World-trademarked windows solely from AMI was not a "change in policy," but rather the implementation of a contractual provision concerning vendor approval as set forth in the licensing agreements. As in *Queen City Pizza*, "[i]f the contractual restrictions . . . were viewed as overly burdensome or risky at the

time they were proposed, [Plaintiffs] could have purchased a different [franchise], or made some alternative investment." *Queen City Pizza*, 124 F.3d at 441.

57. Although the Court recognizes, as did the Third Circuit in *Queen City*, that "relevant market determinations are inherently fact intensive" and "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," this general rule, under either North Carolina or federal law, is not "a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under [Rule 12(b)(6).]" *Queen City Pizza*, 124 F.3d at 436 (granting Federal Rule 12(b)(6) motion for failure to plead a valid relevant market); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) ("Cases in which dismissal on the pleadings is appropriate frequently involve . . . failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes . . . .").

58. For the reasons set forth above, the Court concludes that Plaintiffs have failed to allege a valid relevant market over which Window World maintained market power sufficient to maintain a claim under section 75-1. As a result, the Court determines that Window World's Motions should be granted.

59. Plaintiffs request that, if the Court determines, as it has, that Plaintiffs' section 75-1 claim should be dismissed, such dismissal should be without prejudice, and that Plaintiffs should be permitted leave to amend their complaints to address pleading deficiencies. The Court concludes, however, that any such amendment would be futile. As has been explained, the market limited to Window World

franchisees that Plaintiffs insist is the relevant one cannot, as a matter of law, constitute a valid market for antitrust liability in the circumstances pleaded here. Further, Plaintiffs do not contend, nor does it appear that they could contend, that Window World has market power in a market properly defined by the reasonable interchangeability of use. *See, e.g., Queen City Pizza*, 124 F.3d at 439 ("[H]ere, it is uncontested that contractual restraints aside, the . . . products . . . approved for use by Domino's franchisees are interchangeable with other items available on the market.").

60.     Therefore, the Court concludes, in the exercise of its discretion, that allowing Plaintiffs to amend their complaints with respect to Plaintiffs' section 75-1 would be futile, and that Plaintiffs' claims should be dismissed with prejudice.

V.

CONCLUSION

61.     For the foregoing reasons, the Court hereby **GRANTS** the Motions and **DISMISSES** Plaintiffs' Ninth Cause of Action under N.C. Gen. Stat. § 75-1 in the Roland Action and Plaintiffs' Eleventh Cause of Action under N.C. Gen. Stat. § 75-1 in the Lomax Action, each with prejudice.

**SO ORDERED**, this the 25th day of October, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases